(No. 29030.—)

FIRST TRUST AND SAVINGS BANK OF KANKAKEE, Admr.,
*et al.,* Appellants, *v.* ARTHUR N. POWERS, Appellee.

*Opinion filed January 23, 1946—Rehearing denied March 14, 1946.*

98

LEN H. SMALL and SAMUEL H. SHAPIRO, of Kankakee, and WERNER W. SCHROEDER, of Chicago, for appellants.

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND (FLOYD E. THOMPSON, of counsel,) both of Chicago, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

October 31, 1941, the plaintiffs, First Trust and Savings Bank of Kankakee, as administrator *de bonis non* with the will of Frank Belleau annexed, and Claude M. Granger, administrator to collect of the estate of Mary Belleau, filed their complaint in chancery in the circuit court of Kankakee county against the defendant, Arthur N. Powers. By their complaint, they seek an accounting and recovery from defendant of $25,000, plus interest at the rate of six per cent from July 1, 1929, on the theory that defendant is a trustee as to this sum by virtue of a written agreement of this date entered into between himself and Frank Belleau. The chancellor denied defendant's motion to dismiss the complaint on the ground that the county court of Kankakee county had exclusive jurisdiction of the cause. Defendant's answer, then filed, denies any interest on the part of Granger, as administrator. The answer further denies (a) execution of the instrument, and (b) that $25,000, or any consideration, was ever received by him, and avers that plaintiffs' claim, in any event, is barred by the ten-year statute of limitations. (Ill. Rev. Stat. 1945, chap. 83, par. 17.) Defendant interposed a counterclaim alleging that, at and prior to the time this action was instituted, plaintiffs were indebted to him in an amount of $1954.15

for money loaned and cash advanced to Belleau, none of which had been paid. Plaintiffs filed a reply traversing all new matters or defenses set up by the answer, including the counterclaim. Later, defendant amended his answer, interposing the defenses of (a) *laches,* (b) Belleau's "insufficient financial condition" to have obtained $25,000 to advance to defendant, and (c) a lack of certainty and definiteness requisite to constitute the agreement a contract. Plaintiffs replied, denying the material allegations of this amendment to the answer. Defendant again amended his answer to interpose the five-year statute of limitations (Ill. Rev. Stat. 1945, chap. 83, par. 16,) and a reply by plaintiffs likewise denied application of this statute. After a hearing, the chancellor entered a decree and money judgment in favor of plaintiff bank for $25,000, plus six per cent interest, as asked. No judgment was rendered in favor of Granger, as administrator. Defendant's counterclaim was also allowed, and the amount of $1954.15 was ordered to be deducted from the judgment in favor of plaintiff bank. Upon appeal to the Appellate Court for the Second District, the judgment of the circuit court was first affirmed. A petition for rehearing was granted, and a second opinion filed, holding the agreement void as against public policy. The judgment of the circuit court was reversed without remandment. The cause is here upon petition for leave to appeal allowed by this court.

By their complaint, plaintiffs allege that, during administration of the estate of Frank Belleau, defendant filed a claim for $1954.15 upon a purported open account beginning March 24, 1928, and continuing to the death of Belleau; that, in the course of conducting a defense against this claim, the bank discovered the existence of the agreement dated July 1, 1929, between Belleau and defendant; that, in this agreement, defendant admitted receiving from Belleau the sum of $25,000 for investment, to be returned to Belleau with interest at six per cent per annum, together

with one half of the profits, if any, of the transaction. It is alleged that no part of the $25,000, or interest, was paid to Belleau in his lifetime, or to his personal representatives since his death.

The agreement of July 1, 1929, recites that Belleau desires to deposit with defendant the sum of $25,000 for investment; that defendant has purchased, and will thereafter purchase, certain acreage of real property required in connection with a hydroelectric project of Illinois Light and Power Company on the Kankakee river and, incident to the purchase of the property actually required for the project, has purchased, and will be able to purchase, additional lands which may later be sold at a good profit, in which profit Belleau desires to share, and that defendant is willing Belleau now deposit the sum of $25,000 and receive his proportionate share of the profits resulting from the purchases to be made by Powers. The agreement next recites a consideration of one dollar each to the other in hand paid, and that other good and valuable considerations have been paid. It is stated that it is agreed Belleau has paid over to defendant the sum of $25,000, which defendant acknowledges having received, and that the sum so deposited is to draw interest at the rate of six per cent per annum from the date of the agreement; that defendant will continue to purchase property for the power project and, in connection therewith, will purchase other lands abutting the lands acquired for the project which, in his opinion, will become valuable and may later be sold, when the power project shall have been completed, at a price in excess of the sum paid therefor. The agreement expresses the understanding and agreement of the parties that the contemplated purchases shall be made by defendant because of his knowledge of the project and property values and, in particular, his knowledge of the most attractive parcels to be acquired with respect to their later sale and use for home sites. The contract further recites it is understood

that all property so purchased shall be held and not sold until the power project has been completed and ready for operation, or that the property will not be sold until the price obtainable therefor is increased by approximately five times its original cost, in either of which events, defendant shall have the sale thereof and divide the proportionate profits. Lastly, the contract declares that, as and when the property shall ultimately be sold, there shall first be paid to Belleau the entire sum of money now deposited, to which shall be added and paid to him interest at the rate of six per cent per annum from the date of the agreement until the date of payment. Upon payment of these sums to Belleau, it is provided that the proceeds of any sale when made, to the extent of the proportionate share of funds so deposited by Belleau, shall thereafter be divided equally, one half to Belleau and the other half to defendant.

It was stipulated that no hydroelectric plant bordering the Kankakee river was ever completed, and that no lands were purchased by defendant pursuant to the agreement of July 1, 1929. The agreement itself was introduced in evidence, as plaintiffs' exhibit 3, upon the testimony of two officials of the City National Bank of Kankakee, who identified the signature of defendant to the instrument, over objections by defendant that only one signature to the instrument had been proved, that the agreement was indefinite, incompetent and immaterial, that it was not a contract or legal document, and, further, that it was not an original, but a copy. Frank and Mary Belleau, it appears, died on October 28, 1933, and November 4, 1935, respectively. A copy of their joint will, dated May 3, 1932, was admitted in evidence, together with a copy of the inventory filed August 22, 1941, by plaintiff bank in the estate of Frank Belleau. This inventory discloses Belleau died possessed of some mortgaged land which the estate lost by foreclosure, eighteen shares of Commonwealth Edison Company stock having an aggregate par value of $450, and cash in the

amount of $139.50. In the will, devising the estate of each to the one who should survive, it was provided that upon the death of both, all remaining property should go to defendant Powers, or in the event of his prior death, to his youngest daughter, that the mother of the latter should be her guardian, if she should be a minor, to manage the property until the daughter reached her majority, when all property was to be conveyed to her. The will further provided that any mortgage upon the property should be paid by defendant. Also admitted by stipulation was the renunciation by defendant of the provisions made for him in the will of Frank Belleau, as well as renunciations by him and his wife on behalf of their minor daughter of the bequests to her. Defendant's testimony in his own behalf was confined solely to identifying the book on which he based his counterclaim, introduced in evidence as defendant's exhibit 1, containing an account in his own handwriting with Belleau, and his assertion that the entries were true and correct.

To sustain the judgment of the Appellate Court, defendant contends that the agreement of July 1, 1929, is contrary to good morals, against public policy and, consequently, void. In *Groome* v. *Freyn Engineering Co.* 374 Ill. 113, quoting from *Zeigler* v. *Illinois Trust and Savings Bank,* 245 Ill. 180, this court stated: "There is no precise definition of public policy, and consequently no absolute rule by which a contract can be measured or tested to determine whether or not it is contrary to public policy. Each case, as it arises, must be judged and determined according to its own peculiar circumstances. The public policy of the State or of the nation is to be found in its constitution and its statutes, and when cases arise concerning matters upon which they are silent, then in its judicial decisions and the constant practice of the government officials. [Citations.] Courts will not look to other sources to determine the public policy of a State. As was said in

*Hartford Fire Ins. Co.* v. *Chicago, Milwaukee and St. Paul Railroad Co.* 70 Fed. 20, "The public policy of a State or nation must be determined by its constitution, laws and judicial decisions—not by the varying opinions of laymen, lawyers or judges as to the demands of the interests of the public.' "

Where a contract is illegal or against public policy, a court of equity will not, at the instance of one of the parties who participates in the illegal or immoral intent, either compel the execution of the agreement or set it aside after it has been executed, because to give relief in such a case would injure and counteract public morals. The application of this rule is not in the interest of any party to the illegal or immoral transaction but is in the interest of the general public. (*Vock* v. *Vock,* 365 Ill. 432.) Again, this court will not afford a party relief under an agreement confessedly void as against public policy, even though the question is not raised by an adversary. (*Vock* v. *Vock,* 365 Ill. 432.) Whenever the illegality of an agreement appears, regardless of the source from which the evidence emanates, the disclosure is fatal to the action and no valid judgment can properly be entered recognizing and enforcing the terms of the purported contract in whole or in part, when the public interest so appears, irrespective of whether the defense is pleaded. (*Coppell* v. *Hall,* 7 Wall. (U.S.) 558.) The rule that the defense of illegality of an agreement is open at any time in the course of litigation has two aspects, one theoretical and the other practical. As observed in the comment to section 598 of 2 Restatement of Contracts, "the rule of public policy that forbids an action for damages for breach of such an agreement is not based on the impropriety of compelling the defendant to pay the damages. That in itself would generally be a desirable thing. When relief is denied it is because the plaintiff is a wrongdoer, and to such a person the law denies relief. Courts do not wish to aid a man who founds his cause of

action upon his own immoral or illegal act. If from the plaintiff's own statement or otherwise it appears that the bargain forming the basis of the action is opposed to public policy or transgresses statutory prohibitions, the courts ordinarily give him no assistance. The court's refusal is not for the sake of the defendant, but because it will not aid such a plaintiff. * * * To deny such persons recovery, though an equally guilty defendant thereby escapes punishment, tends to diminish the number of illegal agreements." If the question that an agreement is void as against public policy is not raised by a party to an action it is not only proper but necessary that the court *sua sponte* interpose the defense. Since the question may be urged at any time or upon motion of the trial court or court of review, it follows necessarily that a litigant may advance the proposition in a petition for a rehearing.

Defendant argues that the natural result of carrying out the agreement of July 1, 1929, would be the corruption of an official of a public utility corporation and injury to its shareholders and the consumers of electric energy produced and sold by it. The tendency of the agreement, it is urged, was not only to influence defendant, as a vice-president of Illinois Light and Power Company, to exercise a biased and self-serving judgment in locating the site of the dam, but in the performance of other duties devolving upon him in determining the height of the dam and the consequent area which would be flooded. The obvious result of the alleged agreement, defendant further insists, would be to corruptly influence him, as an officer of the company, to purchase lands not needed for the project and to so manipulate the price paid for lands required as to enable himself and his fellow conspirators to acquire adjoining lands at bargain prices. The inevitable tendency said to follow is to produce official delinquency and to saddle the shareholders of the company and the consumers of its products with the excess cost, thus fixing the char-

acter of the alleged contract and rendering it *contra bonos mores*.

*Bestor* v. *Wathen*, 60 Ill. 138, principally relied upon by defendant to sustain his theory, is not decisive. There, certain officers of a railroad company and of a construction company, charged with the duty of locating and building a new railroad, entered into an agreement with several landowners to locate a town on their land in consideration of the officers sharing in the profits from the sale of town lots. An action was brought to enforce the contract. This court pertinently observed: "A court of equity will not enforce a contract resting upon such official delinquency, or even tending to produce it. Such is the character of the contract before us. If we enforce it, we lend the sanction of the court to a class of contracts the inevitable tendency of which is to make the officers of these powerful corporations pervert their trusts to their private gain at the price of injury at once to the stockholders and to the public. Rendered into plain English, the contract in this case was a bribe on the part of Wathen and Gibson to the president and other officers of the railway company, and to the contractors who were building the road, of an undivided half of one hundred and sixty acres of land, in consideration of which the road was to be constructed on a certain line and a depot built at a certain point."

Plaintiffs maintain that, in the agreement here under consideration, nothing is stated as to the location of the dam or power plant, its location being entirely dependent upon approval of the Illinois Commerce Commission pursuant to the authority granted it through its jurisdiction of certificates of convenience and necessity. (Ill. Rev. Stat. 1945, chap. 111⅔, sec. 55, par. 56.) Moreover, *Illinois Light and Power Co.* v. *Bedard,* 343 Ill. 618, is cited as proof that a petition for condemnation was filed on June 8, 1928, more than a year prior to the date of the agreement in controversy. Plaintiffs also place reliance upon

section 59 of the Public Utilities Act (Ill. Rev. Stat. 1945, chap. 111⅔, par. 63,) which ordains that the power of eminent domain is given to a public utility corporation only after alterations, additions, extensions or improvements have first been authorized by the Commerce Commission. Plaintiffs, therefore, contend that the location of the proposed dam must necessarily have been, prior to June, 1928, submitted to and approved by an order of the Illinois Commerce Commission,—otherwise there could have been no power of condemnation. Again, it is pointed out that the agreement of July 1, 1929, recites that certain lands had already been purchased for the power project, indicatting that the location had previously been determined. Obviously, no land could have been purchased for the project without previous knowledge of its location.

The agreement of July 1, 1929, on its face, does not lend itself as a basis for the sinister charges leveled against it. No violation of the rules of either common or statutory law appears from its provisions. In fact, nothing appears on its face which apparently could not have been authorized by the board of directors of the utility company. No evidence was introduced by either defendant or plaintiffs tending to disclose the intention of the parties other than as expressed by its terms. Defendant's pleadings in the trial court contain no averments from which any illegal intention could be reasonably deduced. The chancellor sustained the allegations of plaintiffs' complaint and entered a decree and judgment in accordance with its prayer. The Appellate Court first affirmed the money judgment so entered. Not until the charge of illegality was raised in defendant's petition for rehearing did the Appellate Court adopt the view that any illegality existed. Under the circumstances here present, where an agreement appears innocent upon its face, and there is not a scintilla of evidence to the contrary, a presumption of legality obtains. In view of defendant's belated defense of illegality, unless it can

be said that the agreement on its face is illegal, or there is evidence in the record tending to support his conclusion, simple justice requires that there be a hearing before a chancellor on the issue of illegality, to the end that plaintiffs be afforded an opportunity to meet evidence, if any, introduced by defendant in support of this charge. (17 Corpus Juris Secundum, Contracts, sec. 281.) In short, the burden of proving that the agreement is illegal and against public policy rests upon defendant, and if evidence be adduced tending to sustain his charge, then plaintiffs must be permitted to rebut a *prima facie* case if one be made. It would then be competent for plaintiffs to show, if such be the fact, that the land actually necessary for construction of the power project had already been acquired or was under condemnation at and prior to the date the agreement was executed. An assertion of illegality, without any legitimate basis in either the pleadings or the proof, is insufficient. Where, as here, neither the contract itself nor the evidence discloses that the transaction in controversy is infected with illegality, and particularly where the pleadings do not raise the issue, a judgment predicated upon illegality of the transaction, inferred solely from the face of the complaint without reference to the fact whether the land for the dam and the overflow had been already acquired, or other facts, is not only manifestly erroneous, but unjust in the extreme. Because, however, of the serious nature of the long-delayed charge and the paramount interest of the general public in the affairs of public utility companies, upon granting the petition for rehearing, the Appellate Court, in common fairness to all the parties, should have remanded the cause generally.

This conclusion renders unnecessary a disposition of the numerous other contentions advanced and argued by the parties.

Defendant's counterclaim was allowed by the trial court and ordered to be deducted from the money judgment

entered in favor of plaintiff bank. Plaintiffs do not challenge the judgment on the counterclaim, and upon remandment of the cause no further evidence need be taken upon this phase of the litigation. The judgments of the Appellate Court and the circuit court are each reversed and the cause remanded to the circuit court of Kankakee county, with directions to proceed in accordance with the views expressed in this opinion.

*Reversed and remanded, with directions.*