AMERICAN BUYERS CLUB OF MT. VERNON, ILLINOIS, INC., Plaintiff-Appellant, *v.* RONNIE L. HONECKER *et al.*, Defendants-Appellees.

Fifth District   No. 76-193

Opinion filed March 10, 1977.

G. MORAN, J., specially concurring.

William E. Aulgur, of Eldorado, for appellant.

Terry Sharp, of Clark and Sharp, of Mt. Vernon, and Shirley D. Rivers, law student, for appellees.

Mr. PRESIDING JUSTICE CARTER delivered the opinion of the court:

This case comes on appeal from the Circuit Court of Jefferson County. The suit was brought by plaintiff-appellant, American Buyers Club of Mt. Vernon, Illinois, Inc., to recover a balance owed on a promissory note executed by the defendants-appellees, Ronnie and Judy Honecker. The court, sitting without a jury, found for the defendants and plaintiff was ordered to pay defendants the sum of $39.

The plaintiff (hereinafter sometimes referred to as "American" or "the Club") sells memberships in a club, whose members receive a service furnished by the plaintiff. That service consists of the ability of the club to place orders for merchandise with certain manufacturers and obtain this merchandise for members at a substantial savings over the normal retail price of such merchandise. Exemplifying its services, plaintiff claims a member of the club may save 50% of the retail price on items of furniture and from 10%-20% on carpets. The plaintiff has catalogs from manufacturers at its place of business that members may examine and from which they may place orders for merchandise.

Defendants testified that they own and operate a furniture upholstering business. A meeting was arranged by Joe Ross, a salesman for American, with the defendants on November 14, 1974. The salesman explained the benefits of the Club and showed the defendants a picture of a Singer sewing machine which retailed for about $400 but could be obtained through the Club for $114. The salesman also indicated that members could purchase a car or truck from a local Ford dealership in Centralia,

Ill. at a price of just $200 above cost. The defendants paid the required $39.50 down payment, signed the contract presented by the salesman and signed a promissory note obliging them to 24 monthly installments at $19 per month.

Sometime after entering the contract with the club, Ronnie Honecker, a codefendant testified that he inquired from a Ford dealer about buying a new panel truck for his business. Although he informed the salesman of the Ford Co. that he was a member of the Club, Mr. Honecker was unable to purchase a truck at the expected price. In similar manner, the Honeckers tried to purchase a Singer sewing machine from a Singer dealer whom the Honeckers knew personally. Again they found they could not purchase a Singer for $114, even though they were club members. On two occasions Ronnie Honecker wrote to the home office of the Club asking for a list of dealers from which purchases could be made. The list had been promised by the agent Ross at the time the Honeckers had entered the membership contract. The first letter was unanswered and in response to the second letter the home office sent the Honeckers two Club membership cards.

After making four monthly installments on the promissory note, Ronnie Honecker discontinued further payments. The Club brought action to enforce payment on the contract. The Honeckers raised the affirmative defenses of material breach of promise, fraud in the inducement and failure of consideration, and alleged that plaintiff violated various provisions of the Consumer Fraud and Deceptive Business Practices Act. Ill. Rev. Stat., ch. 121½, par. 261 *et seq.*

At the trial, Everett Watts, president of the Club, testified that his corporation had no purchasing arrangement with the Singer sewing machine company but that a member of the club could purchase a Morris sewing machine for the same price.

■■ Plaintiff's counsel argues in his brief that the trial judge erred in allowing as evidence the prior statements and representations made by plaintiff's agent to the defendants. We believe that this testimony attempting to show that the salesman led the defendants to believe that they could purchase a Singer sewing machine from the Club was properly admitted at trial. First, it is well settled law that where fraud has been alleged, competent evidence as to the fraudulent representations which procured the execution of a contract is admissible to prove the invalidity of the contract. (12 Ill. L. & Prac. *Contracts* §134 (1955); Corbin on Contracts §580 (1960); *Air Conditioning Training Co. v. Hildebrand*, 330 Ill. App. 134, 69 N.E.2d 700; *Jason v. Drane*, 95 Ill. App. 2d 244, 237 N.E.2d 862.) In the present case, the defendants had properly raised the issue of fraudulent inducement in their pleadings, consequently it was proper for the court to consider prior or contemporaneous evidence to determine the merits of that claim.

■■ Having concluded that no error was committed by the trial court in admitting the parol evidence in question, we must accept the finding of the trial court that such representations were in fact made. That finding is not against the manifest weight of the evidence.

■■ The defendants call attention to the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1975, ch. 121½, pars. 261-272) and the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1975, ch. 121½, pars. 311-318). The purpose of this legislation, as stated in the preamble of the Consumer Fraud Act is:

> "[T]o protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce and to give the Attorney General certain powers and duties for the enforcement thereof."

Taken together, these two Acts indicate a decisive move on the part of the Illinois legislature to enact broad protective coverage of consumers from the many types of deceptive or unfair selling and advertising techniques used by businesses.

Defendants contend that the conduct of plaintiff and its agent in soliciting their membership in the Club falls within the range of practices proscribed by this legislation. After a thorough study of these two acts, we agree with defendants' contention.

Section 2 of the Consumer Fraud Act states:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." Ill. Rev. Stat., ch. 121½, par. 262.

Section 2 of the Uniform Deceptive Trade Practices Act stated:

> "A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:
> (1) passes off goods or services as those of another;
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship approval or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;

(4) uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

(6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

(7) represents that goods or services are a particular standard, quality or grade or that goods are a particular style or model, if they are of another;

(8) disparages the goods, services or business of another by false or misleading representation of fact;

(9) advertises goods or services with intent not to sell them as advertised;

(10) advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quality;

(11) make false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. * * *" (Ill. Rev. Stat., ch. 121½, par. 312.)

We have found very few Illinois cases dealing with the applicable parts of these acts and none that are directly in point. Of those cases dealing with the acts we make the initial observation that each has recognized the broad protective philosophy of the legislation. (*Personal Finance Co. v. Meredith*, 39 Ill. App. 3d 695, 350 N.E.2d 781 (1976); *Household Finance Corp., v. Mowdy*, 13 Ill. App. 3d 822, 300 N.E.2d 863 (1973); *Rice v. Snarlin, Inc.*, 131 Ill. App. 2d 434, 266 N.E.2d 183 (1970).) Despite the dearth of precedent cases, we have found the interplay between the history of the Consumer Fraud Acts and the existing applicable cases to be most illuminating in our quest for the manner in which this legislation applies to the case at bar.

In the case of *Rice v. Snarlin, Inc.*, 131 Ill. App. 2d 434, 266 N.E.2d 183, this court was confronted with the issue, *inter alia,* of whether a private right of action could be had under section 2 of the Consumer Fraud Act. (Ill. Ann. Stat., ch. 121½, par. 262 (Smith-Hurd Supp. 1976-77).) The Act in 1970 did not provide generally for a private right of action. Only section

21, pertaining to the collection of an obligation by communication with an employer, expressly authorized suits for civil damages by an injured party. The attorney general, as amicus curiae, contended that plaintiff could not pursue damages under the Consumer Fraud Act since the right of action was, with the exception of section 21, given expressly to the attorney general. Using a statutory interpretation approach, this court determined that the legislature intended a liberal application of the Act, and held that a private remedy could be had under all sections of the Consumer Fraud Act. In giving his option, Mr. Justice Stamos wrote:

> "The sections declaring various practices unlawful clearly expand the consumers' rights beyond that of the common law. * * * By creating liability on the part of the seller, the legislature obviously must have intended to invest the consumer with the right to enforce his claim. To deny this right would be to effectively release the seller from the liability provided for in the Act." (131 Ill. App. 2d 434, 441-42.)

Notwithstanding strong arguments to the contrary, the court's decision to expand the Consumer Fraud Act by allowing a private right of action was based on the remedial nature of the Act and a belief that the Illinois legislature intended this Act to be liberally construed so as to effect the broad protective spirit of the Act. See Comment, *Private Remedies Under the Consumer Fraud Acts: The Judicial Approaches of Statutory Interpretation and Implication*, 67 NW. U. L. Rev. 413 (1972).

■■ Following the *Rice* decision, the Illinois legislature responded in a way which we believe is highly significant for the case at bar. Effective October 1, 1973, the legislature revised the Consumer Fraud Act by adopting section 10a (par. 270a) which expressly allows a private right of action under any subsection of Section 2 of the Act. In so doing, the legislature put its subsequent stamp of approval on the judiciary's initiative in expanding the application of the Act. As if this were not enough however, the legislature went on to enact the additional provision, section 11a entitled "Construction of Act," which states: "This Act shall be liberally construed to effect the purposes thereof." (Ill. Rev. Stat., ch. 121½, par. 271a, eff. Oct. 1, 1973.) In view of this legislative behavior we perceive a clear mandate from the Illinois legislature that the courts of this State are to utilize the Consumer Fraud Act to the utmost degree in eradicating all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers.

The Consumer Fraud Act, section 2, incorporates into its enumerated unlawful practices, those described in section 2 of the Uniform Deceptive Trade Practices Act, which we have previously listed. Of the 12 subsections in section 2 of the Uniform Deceptive Trade Practices Act we believe three apply to the acts of plaintiff in this case, any one of

which would sufficiently proscribe such conduct as being "unlawful."

"A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

* * *

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship approval or certification of goods or services;

* * *

(7) represents that goods or services are a particular standard, quality or grade or that goods are a particular style or model, if they are of another;

* * *

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

In the case at bar plaintiff's salesman led the defendants to believe that the sewing machine the Club could provide was a Singer brand, which brand was well known to the defendants. Insofar as this was an inducing factor toward the defendants entering the contract with the Club, we find that this representation by plaintiff caused "likelihood of confusion or of misunderstanding as to the source * * * of goods or services" (no. 2). We also find that the plaintiff represented "that goods or services are of a particular style or model" (no. 7) when in fact they were of another. Plaintiff's agent also assured the defendants of a list of dealers from which goods could be purchased directly. This list was never forthcoming for the reason stated by plaintiff at trial that all goods must be ordered through catalogs at the Club's place of business. This latter requirement of going to the Club's place of business could severely limit the ability of the defendants to avail themselves of the services for which they contracted. We find this conduct of plaintiff may be proscribed by inclusion in "other conduct which similarly creates a likelihood of confusion or of misunderstanding" (no. 12). In our utilization of clause 12 above, we have support from the notes on subsection 12 in Ill. Ann. Stat., ch. 121½, par. 312 (Smith-Hurd Supp. 1976-77), wherein it states:

"This important provision will allow the courts to expand the coverage of the act to include new forms of deceptive conduct which might arise in the future. In the absence of such a provision, the enumerated deceptive practices (subsections (1)-(11) of section 312) might be avoided and the objectives of the act thwarted. Under this section, courts are free to enjoin any conduct which creates a likelihood of confusion or of misunderstanding, even though the conduct in question is not explicitly covered by the other sections of the act."

On the basis of the Uniform Deceptive Trade Practices Act, we hold that the conduct of plaintiff's agent in soliciting the defendants'

membership in the Club in the manner he did in this instance is proscribed by Illinois law. The Illinois Consumer Fraud Act, section 2 (par. 262), also expressly states that consideration is to be given to the interpretation of the Federal Trade Commission and the Federal courts relating to section 5 of the Federal Trade Commission Act (15 U.S.C.A. §45). From the Federal court decisions we find abundant support for our conclusion.

■■ As we have previously stated, the intention of the seller— his good or bad faith—is not important. Rather, we focus our attention upon the effect that that conduct might have on the consumer who was unjustifiably misled into purchasing that which he did not intend to purchase. In the case before us, the defendants, as consumers, are members of the class which the Illinois Consumer Fraud Act was meant to protect. Based on the uncontradicted evidence of the trial court that plaintiff's agent displayed a picture of a Singer sewing machine and thereby led the defendants to believe they might obtain a sewing machine of this manufacture from the Club, we hold that such conduct of plaintiff was deceptive and misleading within the meaning of the Illinois Consumer Fraud Act.

Section 10a of the Act states that in granting relief, a court may award actual damages or any other relief deemed proper. (Ill. Rev. Stat., ch. 121½, par. 270a.) We hold that the membership agreement entered into by the Honeckers with the Club is hereby rescinded and the judgment of the Circuit Court of Jefferson County is affirmed.

Judgment affirmed.

JONES, J., concurs.

Mr. JUSTICE GEORGE J. MORAN, specially concurring:
I concur with the opinion of the majority in this case, but I believe the contract is so abominable that I must comment on it, even though the matters I discuss are not contained in the briefs submitted by the parties.

This contract violates several provisions of the Illinois Retail Installment Sales Act (Ill. Rev. Stat. 1975, ch. 121½, par. 501 et seq.).

It violates section 3(c)(1) of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 503(c)(1)) because it does not contain the words "retail installment contract" in 10-point bold type at the top of the contract and directly above the space reserved for the signature of the buyer. In fact, the words "retail installment contract" do not appear anywhere in the body of the contract.

It violates section 3(c)(2) of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 503(c)(2)) because it does not contain the notice required by that section in 10-point bold type in the form required.

It violates section 4 of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 504) because it does not contain the name of the buyer in the body of the contract. *Logan Furniture Mart, Inc. v. Davis*, 8 Ill. App. 3d 150, 289 N.E.2d 228; *R.S. Boston Co. v. Chapman*, 131 Ill. App. 2d 385, 266 N.E.2d 767.

In addition, it violates sections 5(1), 5(8) and 5(10) of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 505(1), (8), and (10)) because it does not disclose the cash price, the total amount of the finance charge and the annual percentage rate.

This contract is also in violation of the Federal Truth In Lending Act (15 U.S.C. §1601 *et seq.*). In this case the "club" offered a service contract for a set fee, payable in a down payment which it called an "initiation fee," and 24 installments. The contract was by its terms transferable. A note in negotiable form accompanied the contract and was also to be signed by the person signing the contract. Large type on the instrument proclaimed that there was no finance charge and no annual percentage rate of interest. See *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 36 L. Ed. 2d 318, 93 S. Ct. 1652 (1973); *Joseph v. Norman's Health Club, Inc.*, 386 F. Supp. 780 (E.D. Mo. 1974); *Kriger v. European Health Spa, Inc.*, 363 F. Supp. 334 (E.D. Wis. 1973); *Glaire v. La Lanne-Paris Health Spa, Inc.*, 12 Cal. 3d 915, 528 P.2d 357, 117 Cal. Rptr. 541 (1974).

The law of Illinois provides a defense to those who oppose the enforcement of the contract if that contract is illegal—either as a matter of Illinois or of Federal law. (*First Trust & Savings Bank v. Powers*, 393 Ill. 97, 65 N.E.2d 377; *Zeigler v. Illinois Trust & Savings Bank*, 245 Ill. 180, 91 N.E. 1041.) The relevant Federal statute need not declare the contract void or unenforceable to make itself available to the defendant as a ground for the defense of illegality. (*Ideal Building Material Co. v. Benson Concrete Co.*, 273 Ill. App. 519; *Finch & Co. v. Zenith Furnace Co.*, 245 Ill. 586, 92 N.E. 521.) Where the performance of a contract would have defrauded the United States of income taxes due, it was held unenforceable in *Dormeyer v. Haffa*, 343 Ill. App. 177, 98 N.E.2d 532. Where a contract violated the policy and spirit, but not the letter of the Natural Gas Act (15 U.S.C. §717), it was held to violate Illinois public policy as well. (*In re Estate of Johnson*, 339 Ill. App. 110, 88 N.E.2d 886.) Hence, it is clear that a contract which violates Federal law, even where that law does not purport to (or even where it expressly denies any purpose to) affect State regulated transactions, is nevertheless subject to the defense of illegality or a violation of State public policy.

Finally, I believe this contract is subject to the defense of unconscionability because it is written in a manner to evade State and Federal laws and to deceive the buyer. The contract in question is set out below:

# MEMBER BENEFIT AGREEMENT

In consideration of the fee agreed to in this Agreement, the American Buyers Club, Inc., herein named the Club, agrees to provide the MEMBERS(S) named below the benefits and privileges described in this Agreement.

## I  BENEFITS And PRIVILEGES
## of Membership in American Buyers Club

**Appliances** _____ To arrange purchases of MAJOR HOUSEHOLD APPLIANCES for MEMBERS' personal use at discount prices ranging from 10% to 50% less than Manufacturers suggested retail prices.

**Furniture** _____ To arrange purchases of HOUSEHOLD FURNITURE for MEMBERS' personal use at Clubs' cost plus freight and delivery plus 6% handling and warehouse expenses.

**Carpeting** _____ To arrange purchase of CARPETING for MEMBERS' personal use at Clubs' cost plus freight and delivery, plus 6% handling and warehouse expenses. (Labor and installation charges are in addition to the cost of the carpet purchased.)

**Social Functions** _ The MEMBERSHIP PASS will permit a MEMBER to attend any Social Event or use of any facilities where AMERICAN BUYERS CLUB, INC. has an American Buyers Club.

In addition to SOCIAL BENEFITS the MEMBER(S) are entitled to purchase APPLIANCES, FURNITURE and CARPETING for PERSONAL USE from the date of this agreement, but not for resale.

## II  MEMBERSHIP FEE
## NON-EXPIRING Benefits and Privileges TOTAL FEE $495.50

TO JOIN THE CLUB AN INITIATION FEE OF $39.50 IS REQUIRED TO BE SUBMITTED WITH THIS AGREEMENT AND APPLICATION, and the MEMBER WILL BE REQUIRED TO PAY 24 CONSECUTIVE MONTHLY INSTALLMENTS (DUES) OF $19.00 per month. Processing of an Application will usually take from three to fourteen days before acceptance of the Member's Application can be determined and approved. After acceptance a MEMBERSHIP PASS will be issued to each Member and a payment book will be forwarded. In the event an Applicant is not qualified for Membership, any money submitted with this Agreement will be refunded to Applicant.

### FINANCE CHARGE NONE                    INTEREST RATE NONE

## III  MEMBER(S) PLEDGE

The MEMBER(S) understand and agree that they have hereby joined an AMERICAN BUYERS CLUB and agree to pay the initiation fee and to pay 24 consecutive monthly installments of $ _19.00_ a month commencing _12/5_, 19_74_. The MEMBER(S) understand that they agree to use the facilities provided by AMERICAN BUYERS CLUB exclusively in the exercise of benefits and privileges of the club and agree that the merchandise ordered will not be resold for a profit and will be for personal use and that the membership pass may only be used by the undersigned MEMBER(S).

MEMBER(S) authorize and direct the Club to sell or assign this agreement to any bank or finance company selected by the Club and agree to make all payments to assignee. When any installment is 30 days past due, or if MEMBER(S) fail to perform a duty(s) under this agreement the entire unpaid balance then remaining may at the option of the Club or holder, be called due and shall be payable immediately without demand and shall bear interest at a rate not in excess of the lawful maximum. MEMBER(S) shall reimburse the Club for all expenses incurred in protecting and enforcing MEMBER(S) rights under this agreement and will include without limitation reasonable attorney's fees and legal expenses.

MEMBER(S) understand that if MEMBER(S) request it, the club will attempt to arrange time financing for merchandise ordered by the MEMBER(S), however Club does not guarantee such financing.

The MEMBER(S) further understand that no oral promise or statements not contained herein shall obligate or be binding on an American Buyers Club or AMERICAN BUYERS CLUB, INC. MEMBER(S) further agree that they shall not assert against an assignee of the Club's rights under this agreement or the note herein, any claims of defenses MEMBER(S) may have against the Club and assignee shall have no express or implied obligation to perform Club duties under the agreement.

MEMBER(S) UNDERSTAND THAT in the event MEMBER(S) elect to rescind this Agreement THIS AGREEMENT MAY BE CANCELLED AT ANY TIME BY NOTIFYING THE SELLER AT THE ADDRESS SHOWN ON THIS AGREEMENT, AND BY RETURNING TO THE SELLER IN IT'S ORIGINAL CONDITION THE MEMBER'S COPY OF THIS AGREEMENT AND ANY OTHER DOCUMENTS GIVEN TO THE MEMBER BY AMERICAN BUYERS CLUB, INC.. IF NO SUCH NOTICE OF CANCELLATION IS GIVEN BY THE MEMBER AFTER THREE (3) FULL BUSINESS DAYS FOLLOWING THE DAY ON WHICH THIS AGREEMENT IS SIGNED, THIS AGREEMENT, AND ALL OF ITS PROVISIONS, SHALL GOVERN THE RELATIONSHIP BETWEEN THE PARTIES DESCRIBED HEREIN, AND THE AGREEMENT SHALL BE NON-CANCELLABLE.

NOTICE TO THE MEMBER(S): 1. You have the right to give the assignee named, or if no assignee is named, to give the club written notice of any defense or right of action which you may have against the club within five (5) days of delivery of the service described herein. If a notice is not received within that time, you may not assert such defense or right of action against the assignee. 2. Do not sign this agreement before you read it or if it contains any blank spaces. 3. You are entitled to an exact copy of the agreement you sign. 4. Under the law you have the right, among others, to pay in advance the full amount due. 5. Purchasers acknowledge receipt of any exact copy of this contract which has been signed by both MEMBER(S) and the Club. 6. This agreement includes all the provisions on the reverse side.

AMERICAN BUYERS CLUB OF MT. VERNON
Rt. 37 North
Mt. Vernon, Illinois 62864

-3-  Signed X _Q. J. Horeck_
Member (Buyer)

Once an applicant has been accepted into the CLUB, a MEMBERSHIP CARD will be issued, entitling the MEMBER and SPOUSE to use the CLUB facilities and Catalogs to order Merchandise. The Membership Card entitles the MEMBER to attend CLUB SOCIAL FUNCTIONS at any AMERICAN BUYERS ACTIVITIES in any area that American Buyers has an office.

## APPLIANCE DIVISION

Although some lines of nationally advertised appliances may not be available, the club can acquire approximately 70% of most popular lines. Contact the local manager by phone or mail and he will advise you as to what lines are available. The Member is advised to select the make, model and color plus a retail price quotation, then contact the Club for a price comparison. In most instances you will find you can save 10 to 50% through the Club, which is usually 25 to 35% less than the manufacturers suggested retail price.

When the price is quoted by the Club it must be understood that the suppliers all reserve the right to change their prices and the final cost could differ from the "quoted price." American Buyers has no control over suppliers inventory or method of shipment. Additional charges for freight, sales tax, delivery and installation will be added to the cost of the item as they apply. The Club will only order NEW MERCHANDISE and will not order Distressed, Damaged or Factory Second Merchandise. You will be entitled to all Manufacturers Warranties and "Service Policies."

## FURNITURE DIVISION

The Club has 3 or more suppliers to select Furniture, for every room in your home. There are thousands of fabric combinations to choose from and the Club can satisfy most "Custom Orders." You will normally be able to save $100.00 to $200.00, below retail prices, on a living room suite alone.

The Club furnishes the Member with the opportunity to order from over 30 different manufacturers. In most instances you will save from 10 to 50% less than retail prices. Members should attempt to visit the "Buyers Room" at the Club office often, merely to get acquainted with the vast variety of items to choose from.

## CARPET DIVISION

The Club has two or more Carpet Manufacturers to make your selections from. Each sample is usually available in several different colors. Before ordering Carpet or Padding you should determine the amount and cost through a retail source. By doing this you will be more aware of the type carpeting you will want to order. Arrangements for carpet installation can usually be made with local installers. In many instances Members have found that they have saved more than their membership fee on ordering just carpeting through the Club.

## PAYMENT OF MERCHANDISE

Unless prior arrangements have been made, to finance the cost of the merchandise, a down payment of 25% of the cost is required before the order will be placed with the supplier. The balance is due upon delivery and there will be NO OPEN ACCOUNTS.

If you wish to "Finance" the order you must make arrangements at the time you place the order. Financing is available at the Clubroom for those who qualify.

When ordering Furniture, allow 6 weeks to 90 days for delivery, inasmuch as most manufacturers do not stock all the items they manufacture. In some instances a shipment could take even longer. Please remember that the Club has no control over the Suppliers inventory or method of shipment.

Date _11/14/74_

NOTICE OF CANCELLATION — YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.
IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN 10 BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.
IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLERS EXPENSE AND RISK.
IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN 20 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.
TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO: AMERICAN BUYERS CLUB OF MT. VERNON, AT RT. 57 NORTH, MT. VERNON, ILLINOIS 62864, NOT LATER THAN MIDNIGHT OF _11/17/74_
(DATE)

After reading this contract, one cannot escape the conclusion that it was designed to make the purchaser believe he was a member of a club rather than a puchaser of goods or services. The first payment is called an "initiation fee." The remainder of the payments are called "dues." The agreement is termed a "member benefit agreement." However, it is apparent that there are no club benefits involved and that the purchasers are members of a club in name only.

The contract does not provide for membership powers in the election of officers or directors, nor does it allow membership powers in decisions with respect to club policy or the cost of club services. The member, as he is called, may not resign if he is displeased with the operation of the club activities described other than his right to buy something wholesale. This contract gives the purchaser a great deal of words and status, but nothing of real value for his "total fee" of $495.

For a scholarly discussion of the doctrine of unconscionability as applied to sales contracts, see Annot., 18 A.L.R. 3d 1305 (1968).