(No. 34723.—

VIRGINIA O'CALLAGHAN, Admrx., Appellant, *vs.* WALLER & BECKWITH REALTY COMPANY, Appellee.

*Opinion filed November 26, 1958—Rehearing denied Jan. 22, 1959.*

BRISTOW, J., and DAILY, C.J., dissenting.

JAMES A. DOOLEY, of Chicago, for appellant.

PETERSON, LOWRY, RALL, BARBER & Ross, of Chicago, (A. R. PETERSON, OWEN RALL, HAROLD W. HUFF, and HERBERT C. LOTH, JR., of counsel,) for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This is an action to recover for injuries allegedly caused by the defendant's negligence in maintaining and operating a large apartment building. Mrs. Ella O'Callaghan, a tenant in the building, was injured when she fell while crossing the paved courtyard on her way from the garage to her apartment. She instituted this action to recover for her injuries, alleging that they were caused by defective pavement in the courtyard. Before the case was tried, Mrs. O'Callaghan died and her administratrix was substituted as plaintiff. The jury returned a verdict for the plaintiff in the sum of $14,000, and judgment was entered on the verdict. Defendant appealed. The Appellate Court held that the action was barred by an exculpatory clause in the lease that Mrs. O'Callaghan had signed, and that a verdict should have been directed for the defendant. (15 Ill. App. 2d 349.) It therefore reversed the judgment and remanded the cause with directions to enter judgment for the defendant. We granted leave to appeal.

In reaching its conclusion the Appellate Court relied upon our recent decision in *Jackson* v. *First National Bank,* 415 Ill. 453. There we considered the validity of such an exculpatory clause in a lease of property for business purposes. We pointed out that contracts by which one seeks to relieve himself from the consequences of his own negligence are generally enforced "unless (1) it would be against the settled public policy of the State to do so, or (2) there is something in the social relationship of the parties militating against upholding the agreement." (415 Ill. at 460.) And we held that there was nothing in the public policy of

the State or in the social relationship of the parties to forbid enforcement of the exculpatory clause there involved.

The exculpatory clause in the lease now before us clearly purports to relieve the lessor and its agents from any liability to the lessee for personal injuries or property damage caused by any act or neglect of the lessor or its agents. It does not appear to be amenable to the strict construction to which such clauses are frequently subjected. (See 175 A.L.R. 8, 89.) The plaintiff does not question its applicability, and she concedes that if it is valid it bars her recovery. She argues vigorously, however, that such a clause is contrary to public policy, and so invalid, in a lease of residential property.

Freedom of contract is basic to our law. But when that freedom expresses itself in a provision designed to absolve one of the parties from the consequences of his own negligence, there is danger that the standards of conduct which the law has developed for the protection of others may be diluted. These competing considerations have produced results that are not completely consistent. This court has refused to enforce contracts exculpating or limiting liability for negligence between common carriers and shippers of freight or paying passengers, (*Chicago and Northwestern Railway Co.* v. *Chapman,* 133 Ill. 96,) between telegraph companies and those sending messages, (*Tyler, Ullman & Co.* v. *Western Union Telegraph Co.* 60 Ill. 421,) and between masters and servants, (*Campbell* v. *Chicago, Rock Island and Pacific Railway Co.* 243 Ill. 620.) The obvious public interest in these relationships, coupled with the dominant position of those seeking exculpation, were compelling considerations in these decisions, which are in accord with similar results in other jurisdictions. See 175 A.L.R. 8.

On the other hand, as pointed out in the *Jackson* case, the relation of lessor and lessee has been considered a matter of private concern. Clauses that exculpate the landlord from

the consequences of his negligence have been sustained in residential as well as commercial leases. (*Manaster* v. *Gopin,* 330 Mass. 569 (1953), 116 N.E.2d 134; *Mackenzie* v. *Ryan,* 230 Minn. 378 (1950), 41 N.W.2d 878; *Kirshenbaum* v. *General Outdoor Adv. Co.* 258 N.Y. 489 (1932), 180 N.E. 245; *King* v. *Smith,* 47 Ga. App. 360 (1933), 170 S.E. 546; *Wright* v. *Sterling Land Co.* 157 Pa. Super. 625 (1945), 43 A.2d 614; 6 Williston on Contracts, sec. 1715D; 6 Corbin on Contracts, sec. 1472.) There are intimations in other jurisdictions that run counter to the current authority. (See *Kuzmiak* v. *Brookchester, Inc.* 33 N.J. Super. 575 (1955), 111 A.2d 425; *Kay* v. *Cain* (App. D.C. 1946), 154 F.2d 305.) The New Hampshire court applies to exculpatory clauses in all leases its uniform rule that any attempt to contract against liability for negligence is contrary to public policy. (*Papakalos* v. *Shaka,* 91 N.H. 265 (1941), 18 A.2d 377.) But apart from the *Papakalos case* we know of no court of last resort that has held such clauses invalid in the absence of a statute so requiring.

A contract shifting the risk of liability for negligence may benefit a tenant as well as a landlord. (See *Cerny-Pickas & Co.* v. *C. R. Jahn Co.* 7 Ill.2d 393.) Such an agreement transfers the risk of a possible financial burden and so lessens the impact of the sanctions that induce adherence to the required standard of care. But this consideration is applicable as well to contracts for insurance that indemnify against liability for one's own negligence. Such contracts are accepted, and even encouraged. See Ill. Rev. Stat. 1957, chap. 95½, pars. 7—202(1) and 7—315.

The plaintiff contends that due to a shortage of housing there is a disparity of bargaining power between lessors of residential property and their lessees that gives landlords an unconscionable advantage over tenants. And upon this ground it is said that exculpatory clauses in residential leases must be held to be contrary to public policy. No attempt was made upon the trial to show that Mrs. O'Callaghan was at

all concerned about the exculpatory clause, that she tried to negotiate with the defendant about its modification or elimination, or that she made any effort to rent an apartment elsewhere. To establish the existence of a widespread housing shortage the plaintiff points to numerous statutes designed to alleviate the shortage, (see Ill. Rev. Stat. 1957, chap. 67½, *passim*) and to the existence of rent control during the period of the lease. 65 Stat. 145 (1947), 50 append. U.S.C., sec. 1894.

Unquestionably there has been a housing shortage. That shortage has produced an active and varied legislative response. Since legislative attention has been so sharply focused upon housing problems in recent years, it might be assumed that the legislature has taken all of the remedial action that it thought necessary or desirable. One of the major legislative responses was the adoption of rent controls which placed ceilings upon the amount of rent that landlords could charge. But the very existence of that control made it impossible for a lessor to negotiate for an increased rental in exchange for the elimination of an exculpatory clause. We are asked to assume, however, that the legislative response to the housing shortage has been inadequate and incomplete, and to augment it judicially.

The relationship of landlord and tenant does not have the monopolistic characteristics that have characterized some other relations with respect to which exculpatory clauses have been held invalid. There are literally thousands of landlords who are in competition with one another. The rental market affords a variety of competing types of housing accommodations, from simple farm house to luxurious apartment. The use of a form contract does not of itself establish disparity of bargaining power. That there is a shortage of housing at one particular time or place does not indicate that such shortages have always and everywhere existed, or that there will be shortages in the future. Judicial determinations of public policy cannot readily take account

of sporadic and transitory circumstances. They should rather, we think, rest upon a durable moral basis. Other jurisdictions have dealt with this problem by legislation. (McKinney's Consol. Laws of N.Y. Ann., Real Property Laws, sec, 234, Vol. 49, Part I; Ann. Laws of Mass., Vol. 6, c. 186, sec. 15.) In our opinion the subject is one that is appropriate for legislative rather than judicial action.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

BRISTOW, J., and DAILY, C.J., dissenting:

We cannot accept the conclusions and analysis of the majority opinion, which in our judgment not only arbitrarily eliminates the concept of negligence in the landlord and tenant relationship, but creates anomalies in the law, and will produce grievous social consequences for hundreds of thousands of persons in this State.

According to the undisputed facts in the instant case, this form lease with its exculpatory clause, was executed in a metropolitan area in 1947, when housing shortages were so acute that "waiting lists" were the order of the day, and gratuities to landlords to procure shelter were common. (U.S. Sen. Rep. 1780, Committee on Banking & Currency, vol. II, 81st Cong., 2nd Sess. (1950), p. 2565 *et seq.; Cremer* v. *Peoria Housing Authority,* 399 Ill. 579, 589.) While plaintiff admittedly did not negotiate about the exculpatory clause, as the majority opinion notes, the record shows unequivocally that the apartment would not have been rented to her if she had quibbled about any clause in the form lease. According to the uncontroverted testimony, "If a person refused to sign a [form] lease in the form it was in, the apartment would not be rented to him."

Apparently, the majority opinion has chosen to ignore those facts and prevailing circumstances, and finds instead that there were thousands of landlords competing with each other with a variety of rental units. Not only was the

element of competition purely theoretical—and judges need not be more naive than other men—but there wasn't even theoretical competition, as far as the exculpatory clauses were concerned, since these clauses were included in all form leases used by practically all landlords in urban areas. (*Simmons* v. *Columbus Venetian Stevens Building, Inc.*, 20 Ill. App. 2d 1, 155 N.E.2d 372; 1952 Ill. L. Forum, 321, 328.) This meant that even if a prospective tenant were to "take his business elsewhere," he would still be confronted by the same exculpatory clause in a form lease offered by another landlord.

Thus, we are *not* construing merely an isolated provision of a contract specifically bargained for by one landlord and one tenant, "a matter of private concern," as the majority opinion myoptically views the issue in order to sustain its conclusion. We are construing, instead, a provision affecting thousands of tenants now bound by such provisions, which were foisted upon them at a time when it would be pure fiction to state that they had anything but a Hobson's choice in the matter. Can landlords, by that technique, immunize themselves from liability for negligence, and have the blessings of this court as they destroy the concept of negligence and standards of law painstakingly evolved in the case law? That is the issue in this case, and the majority opinion at no time realistically faces it.

In resolving this issue, it is evident that despite the assertion in the majority opinion, there is no such thing as absolute "freedom of contract" in the law. (*West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379, 392, 81 L. ed. 703.) As Mr. Justice Holmes stated, "pretty much all law consists in forbidding men to do some things that they want to do, and contract is no more exempt from the law than other acts." (Dissent, *Adkins* v. *Children's Hospital of the District of Columbia,* 261 U.S. 525, 568, 67 L. ed. 785.) Thus, there is no freedom to contract to commit a crime; or to

contract to give a reward for the commission of a crime; or to contract to violate essential morality; or to contract to accomplish an unlawful purpose, or to contract in violation of public policy. 12 I.L.P., Contracts, secs. 151, 154.

In the instant case we must determine whether the exculpatory clause in the lease offends the public policy of this State. We realize that there is no precise definition of "public policy" or rule to test whether a contract is contrary to public policy, so that each case must be judged according to its own peculiar circumstances. (*First Trust & Savings Bank of Kankakee* v. *Powers*, 393 Ill. 97, 102.) None would dispute, however, that there is a recognized policy of discouraging negligence and protecting those in need of goods or services from being overreached by those with power to drive unconscionable bargains.

Even the majority opinion recognizes this policy as a possible limitation on the concept of "freedom of contract" in its statement, "when that freedom expresses itself in a provision designed to absolve one of the parties from the consequences of his own negligence, there is danger that the standards of conduct which the law has developed for the protection of others may be diluted." Diluted? As applied in the instant case, the word is "destroyed." When landlords are no longer liable for failure to observe standards of care, or for conduct amounting to negligence by virtue of an exculpatory clause in a lease, then such standards cease to exist. They are not merely "diluted." Negligence cannot exist in abstraction. The exculpatory clause destroys the concept of negligence in the landlord-tenant relationship, and the majority opinion, in sustaining the validity of that clause, has given the concept of negligence in this relationship a "judicial burial."

This court, however, has refused to countenance such a destruction of standards of conduct and of the concept of negligence in other relationships. We have invalidated

such exculpatory clauses as contrary to our public policy in contracts between common carriers and shippers or paying passengers (*Checkley* v. *Illinois Central Railroad Co.* 257 Ill. 491; *Chicago and Northwestern Railway Co.* v. *Chapman,* 133 Ill. 96); between telegraph companies and those sending messages (*Tyler, Ullman & Co.* v. *Western Union Telegraph Co.* 60 Ill. 421); and between employers and employees (*Campbell* v. *Chicago, Rock Island and Pacific Railway Co.* 243 Ill. 620; *Devine* v. *Delano,* 272 Ill. 166; *Consolidated Coal Co.* v. *Lundak,* 196 Ill. 594; *Himrod Coal Co.* v. *Clark,* 197 Ill. 514.)

By what logic and reasoning can you hold that such clauses are void and contrary to public policy in an employer-employee contract, but valid in contracts between landlords and tenants, as the majority opinion does? If the criterion for invalidating exculpatory clauses is the presence of "monopolistic characteristics" in the relationship, as the majority opinion suggests, then do employers have a greater monopoly on the labor market than landlords have on the tenant market? Is there less competition among employers for employees than among landlords for tenants? The facts defy any such reasoning. Nor are there any other cogent grounds for distinguishing between these categories.

The legal anomaly of sustaining such clauses in leases, while voiding them in other types of contracts, when the grounds on which they are held void can be matched by similar grounds in the relationship of landlord and tenant, is pointed out by the court in the aforementioned *Simmons case,* where the court made a scholarly review of the decisions in Illinois and other jurisdictions respecting exculpatory clauses in leases and other contracts. The court stated: "Is it more important that a man should have a safe place to work than that he should have a safe place to live, and is there any more reason in the employer-employee relationship that the employer should not be allowed to avoid

liability for his negligence than there is that a landlord should not be able to avoid the liability for negligence in maintaining the common area which must be used by people to attain ingress and egress when they rent a portion of the premises? Is safety while working more important than safety while living?"

This patent inconsistency respecting the validity of an exculpatory clause, created by the majority opinion, is in no way required by Illinois precedents. The only Illinois authority cited—and this is done indirectly by referring to the Appellate Court's reliance on the case—is *Jackson* v. *First National Bank of Lake Forest,* 415 Ill. 453. However, even a cursory reading of that case reveals that the court, in sustaining an exculpatory clause in a business lease, inferred that a different result would have followed if there was anything in the record indicating that the parties were not on an equal footing, or that the lessee had no freedom of choice, or had to accept what was offered. That court stated at page 463: "This is a business lease. There is nothing to suggest that the parties were not dealing at arms' length and upon equal footing. No facts are brought to our attention from which it might be reasonable to infer that the lessee was forced to take the storeroom upon lessor's terms."

Compare that situation with the facts in the instant case, where it is admitted that there were waiting lists for the apartment and that if a person refused to sign the lease with the exculpatory clause in the form it was in, the apartment would not be rented to him. Only by the blind application of precedent can the *Jackson case* be deemed determinative herein. Nor is there any established line of authority elsewhere sustaining exculpatory clauses in leases, but only conflicting decisions, and a disposition to emasculate such exculpatory clauses by giving them a strict, if not distorted construction. 175 A.L.R. 8, 90; 15 Univ. Pitt. L. Rev. 493, 496.

Furthermore, while *stare decisis* has a strong social justification, it should not be used to stifle the growth of the law. When experience, which Mr. Justice Holmes has stated is the "life of the law," makes manifest that a rule is without vitality, a court cannot abdicate its responsibility of reappraisal.

The basis of voiding exculpatory clauses is that they are contrary to the public policy of discouraging negligence and protecting those in need of goods or services from being overreached by those with power to drive unconscionable bargains. (*Bisso* v. *Inland Waterways Corp.* 349 U.S. 85, 91, 99 L. ed. 911.) In determining whether such clauses should be deemed void, the courts have weighed such factors as the importance which the subject has for the physical and economic well-being of the group agreeing to the release; their bargaining power; the amount of free choice actually exercised in areeing to the exemption; and the existence of competition among the group to be exempted. (Williston, Contracts, vol. 6, p. 4968: "The Significance of Bargaining Power in the Law of Exculpation," 37 Col. L. Rev. 248; 175 A.L.R. 8, 48; 15 Univ. Pitt. L. Rev. 493.) Adjudged by such criteria, it is evident that the subject matter of the exculpatory clause herein—shelter—is indispensable for the physical well being of tenants; that they have nothing even approaching equality of bargaining power with landlords and no free choice whatever in agreeing to the exemption, since they will be confronted with the same clause in other form leases if they seek shelter elsewhere. Although the majority opinion claims that such clauses may also benefit tenants, it is hard for us to envisage a tenant on a waiting list for an apartment, insisting that the lease include a provision relieving him from liability for his negligence in the maintenance of the premises. Consequently, in our judgment, every material ground for voiding the exculpatory clause exists in the lease involved in the instant case.

Similar conclusions have been reached by other courts, after recognizing the change in the status and bargaining power in the landlord-tenant relationship that has taken place. (*Kuzniak* v. *Brookchester,* 33 N.J. Super. 575, 111 A.2d 425; *Kay* v. *Cain* (D.C. Cir.) 154 F.2d 305.) Thus, the New Jersey court stated in the *Kuzniak case* at page 432: "Under *present* conditions the comparative bargaining position of landlords and tenants in housing accommodations within many areas of the state are so unequal that tenants are in no position to bargain, and an exculpatory clause which purports to immunize the landlord from all liability would be contrary to public policy." (Italics ours.)

In the same vein, the Federal court in *Kay* v. *Cain,* 154 F.2d 305, stated at page 306: "Moreover, it is doubtful whether such a clause which would undertake to exempt a landlord from responsibility for such negligence would *now* be valid. The acute housing shortage in or near the District of Columbia gives a landlord so great a bargaining advantage over a tenant that such an exemption might well be invalid on the grounds of public policy." The majority opinion, however, labels such changed conditions as "sporadic" and chooses to ignore them because they may change again at some future time. It holds that judicial determinations of public policy should "rest upon a more durable moral basis." Our concept of the judicial function is not so circumscribed, nor is it elastic in one case and restrictive in another, depending upon economic predilections. It is hard for us to fathom that this same court which enunciated the liberal and scholarly approach of interpreting common-law concepts in the light of contemporary conditions and social needs in *Nudd* v. *Matsoukas,* 7 Ill.2d 608, 619, *Amann* v. *Faidy,* 415 Ill. 422, and *Brandt* v. *Keller,* 413 Ill. 503, can now hold with academic detachment that landlords, who are in the position to dictate whatever terms they choose to those in need of shelter, have a right to immunize themselves by contract from lia-

bility for failure to make essential repairs of areas which the tenants cannot legally repair, and that such contracts do not offend the public policy of this State. Upon what "durable moral basis" does that public policy determination rest?

We prefer to consistently follow our realistic policy of interpreting common-law concepts created by the courts in the light of contemporary conditions, as pledged in *Nudd v. Matsoukas* and the other cases, in accordance with the traditions of the creative jurists of our time. Holmes, *Southern Pacific Co.* v. *Jensen*, 244 U.S. 205, 221, 61 L. ed. 1086; Cardozo, "Growth of the Law."

As Mr. Justice Cardozo explained in his treatise, "Growth of the Law," (Selected Writings of Benjamin Nathan Cardozo, p. 246) : "A rule which in its origin was the creation of the courts themselves and was supposed in the making to express the *mores* of the day, may be abrogated by the courts when the *mores* have so changed that perpetuation of the rule would do violence to the social conscience. * * * This is not usurpation. It is not even innovation. It is the reservation for ourselves of the same power of creation that built up the common law through its exercise by the judges of the past."

In this connection, Mr. Chief Justice Warren more recently observed: "A * * * reason for the success of our legal system is its adaptability to changing circumstances. As Pollack said, all courts have a duty, which ours generally try to perform, 'to keep the rules of law in harmony with the enlightened common sense of the nation.' " "The Law of the Future," Mr. Chief Justice Warren, *Fortune Magazine,* Nov. 1955, p. 107.

The majority opinion apparently dismisses whatever misgivings it has for the resulting social consequences of its decision with the observation that the problem is "appropriate for legislative rather than judicial action," and refers to the New York and Massachusetts statutes. McKinney's

Consol. Laws of N.Y. Ann., Real Prop. Laws, sec. 234, vol. 49, part I; Ann. Laws of Mass, vol. 6, chap. 186, sec. 15.

Future legislation on this subject will be of small comfort to the hundreds of persons with cases pending in our courts for injuries sustained through conduct of landlords tantamount to common-law negligence. What help can the legislature give to such persons? Their only protection lies in the inherent power of the courts to adjudicate common-law rights and their duty to strike down contracts in derogation of the public policy of the State. That duty is in no way abridged by the fact that some legislatures have declared such exculpatory clauses contrary to public policy. We cannot perceive how such legislative action elsewhere relieves this court from its duty of also recognizing the public policy in the case law, which is an equally cogent source of a State's public policy. *People ex rel. Nelson* v. *Wiersema State Bank,* 361 Ill. 75, 86.

Moreover, for this court, which has recently and repeatedly expressly refused to relegate to the legislature the task of reinterpreting common-law concepts necessary in the development of the law (*People ex rel. Noren* v. *Dempsey,* 10 Ill.2d 288, 293; *Nudd* v. *Matsoukas,* 7 Ill.2d 608), to now adbdicate to the legislature, as the majority opinion has done, is not only inconsistent but an admission of failure to resolve the problem. Legislative intrusion into the field of the common law can only be justified when courts have refused to exercise their own function. (Green, "Freedom of Litigation," 38 Ill. L. Rev. 355, 378, 382.) There should be no such refusal by this court in the instant case.

In our judgment, authorizing landlords to immunize themselves from liability for negligence, as the majority opinion has done, at a time of critical housing shortages, recognized by Congress and the courts, is not only inconsistent with much law and the public policy of this State, but it is in derogation of our duty "to keep the rules of law

in harmony with the enlightened common sense of the nation." Therefore, we believe it our obligation to dissent from that opinion, and to protest against the destruction of the common-law rights of a significant proportion of the population of this State.