DANA POINT CONDOMINIUM ASSOCIATION, INC., Plaintiff-Appellee, v. KEYSTONE SERVICE COMPANY, A DIVISION OF COLE COIN OPER-ATED LAUNDRY EQUIPMENT, INC., Defendant-Appellant.

First District (4th Division)   No. 84—2430

Opinion filed March 13, 1986.

Edgar A. Blumenfeld, Ltd., of Chicago, for appellant.

Joyce & Kubasiak, P.C. and Michael H. Moriano, Ltd., both of Chicago (Edward T. Joyce and Michael H. Moriano, of counsel), for appellee.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Plaintiff Dana Point Condominium Association, Inc. (the Association) instituted a declaratory judgment action seeking a judgment order by the trial court that a lease it has with defendant Keystone Service Company (Keystone) is unconscionable and therefore invalid and unenforceable.[1]

Following a hearing, the trial court ruled, *inter alia,* that the lease's terms were not unconscionable, and that Keystone should have the benefit of its bargain but exclusive of Keystone's right to an option which would allow Keystone to extend the lease term.

Both parties appeal.

The Association asserts that the trial court's ruling that the lease was the result of an arm's-length bargain and was not unconscionable is contrary to the manifest weight of the evidence. Keystone claims that the trial court correctly determined that the basic lease is legally proper and enforceable but that the trial court erred in concluding that the option right under the lease was unconscionable and unenforceable.

We affirm the trial court's ruling as to the validity of the basic lease but reverse its ruling as to the option right. We rule that the option right is legally binding and enforceable.

BACKGROUND

Dana Point is a complex of five separate residential buildings containing a total of 504 units. Prior to 1978, Ben Pekin owned and operated the Dana Point complex as rental property. In March of 1978, Pekin sold Dana Point to Haven Equities Corporation (Haven) who, in turn, converted it to a condominium complex. Before Pekin sold the property to Haven, however, on October 1, 1977, he and Keystone executed the lease in dispute here.

Under the terms of the lease, Keystone rents a laundry room in

---

[1]In its complaint, the Association also requested monetary relief for the rent that it previously paid to Keystone. That issue, however, is not part of this appeal.

each of Dana Point's five buildings. Keystone installs, services, and maintains coin operated laundering machines. Keystone is obligated to pay the association $1.25 per condominium unit per month (which when multiplied by 504 units equals $630 per month or $7,560 per year) as rent. The length of the lease is 10 years, and Keystone has an option to renew the lease for an additional 10 years. All utility expenses resulting from the laundering operation are the obligation of the Association, and it is the Association who is responsible for the cleaning and upkeep of the laundry rooms, except for the coin operated laundering machinery. Keystone alone determines the charge for the use of the laundering equipment.[2]

By November 1980, Haven had sold 66% of the Dana Point units as condominiums. At that time, the association took over management of Dana Point's five buildings. Several months later, the Association learned of the lease arrangement with Keystone. The Association immediately demanded of Keystone that it remove its laundry equipment from Dana Point. Keystone, however, refused to do so, citing the lease that it had executed with the Association's predecessor, Ben Pekin. Two years later, on February 25, 1983, the Association filed this declaratory judgment action.

The evidence presented at trial was contradictory in several respects. With respect to the unconscionability issue, for example, both parties tendered experts in the coin operated laundry business.

The Association called Robert Ilg as an expert witness. Ilg has been involved with the coin operated laundry industry for over 20 years. Ilg testified as to his view of the general practice in the coin operated laundry business during the 1977-78 period (the period during which Pekin and Keystone executed the lease). According to Ilg, when a landlord and a laundry service entered into a lease, the amount of rent paid to the landlord was always a percentage, varying from 30% to 60%, of the gross cash receipts taken in by the laundering machines. Ilg stated that flat rate rental agreements, such as that agreed to by Pekin and Keystone, were rarely entered into, for they were unprofitable for the landlord. Ilg also testified that in his experience, lease agreements between landlords and coin-operated laundry services ran for terms of not more than seven years. On cross-examination, however, Ilg admitted that in all cases, the landlord and the laundry service negotiated the final terms upon which they agreed.

[2]The exact terms of the lease read: "lessee agrees to pay no less than $1.25 per 'rented apartment' per month." Dana Point is now a condominium complex and it appears from the record that all of the units have been sold.

Keystone, on the other hand, called Edwin Weiman as its expert witness. Weiman has been involved in the laundry business for the past 30 years. Weiman testified that in his view, there were two types of rental agreements that laundry services and landlords entered into; one involved a flat rental rate calculated on a per-apartment unit basis, and the other was based on a percentage of the gross cash receipts taken in by the laundry machines. It was Weiman's position that the negotiation process ultimately determined upon which rental rate the parties agreed. Weiman also stated that in 1977, the average rate for a lease based on a flat rate until rental basis was $1 per unit and that 10-year leases were not uncommon in the laundry service field.

Louis Cole, president of Keystone, provided the only evidence regarding the bargaining process that he and Pekin had engaged in prior to executing the Dana Point laundry room lease. Cole stated that the terms of the lease were mutually agreed upon and resulted from a give-and-take negotiation process between him and Pekin. Cole also denied paying any bonus or upfront money to Pekin when the lease was signed.

Evidence was also presented regarding the economic impact of the lease agreement. The Association introduced evidence showing that the utility costs for the Dana Point laundry rooms exceed $22,000 per year. Keystone's evidence, however, demonstrated that the utility costs incurred by the Association barely exceed $15,00 per year. In addition, the evidence presented at trial indicates that the laundry machines operating in Dana Point have earned Keystone $32,663.47 in 1978, $22,708.20 in 1979, $29,164.05 in 1980, $34,738.40 in 1981, $37,738.40 in 1982, and $53,861.20 in 1983.

The parties also introduced contradictory evidence addressing the issue of whether residents of Dana Point had constructive notice of the Keystone lease at the time they purchased their condominiums.

The Association called several residents of Dana Point. These residents testified that when they purchased their units, no ownership signs or stickers of any kind were affixed to the machines or walls in the laundry rooms. Each resident also testified that the saleswoman from Haven never informed them of the lease's existence. Consequently, according to these Dana Point residents, they had no way of knowing that the Keystone lease existed at the time they purchased their condominiums.

Keystone countered the statements of the Dana Point residents through the testimony of Louis and David Cole, the president and vice-president, respectfully, of Keystone. Both testified that they per-

sonally placed signs and stickers on the walls and machines in the Dana Point laundry rooms. These signs, according to the Coles, identified Keystone as the lessee of the laundry rooms and were affixed to the walls and machines during the period in which the Dana Point condominiums were being sold.

Upon conclusion of the evidentiary hearing, the trial court ruled that: (1) the lease, at least for the first 10-year period, was not unconscionable and was enforceable; (2) Keystone's lease option was unconscionable and unenforceable; and (3) the residents of Dana Point had constructive notice of the Keystone lease at the time they purchased their condominium units and were bound by the lease terms. The trial court also ruled that there was privity of contract between the Association and Keystone, that the written agreement was a lease, and that there was no consistent failure on the part of Keystone to maintain the laundry machines. These latter rulings, however, are not pertinent to the outcome of this appeal.

Opinion

I

■ We first address the unconscionability issue. It is well settled that public policy strongly favors the right of individuals to freely contract. (*McClure Engineering Associates, Inc. v. Reuben H. Donnelley Corp.* (1983), 95 Ill. 2d 68, 447 N.E.2d 400; *O'Callaghan v. Waller & Beckwith Realty Co.* (1958), 15 Ill. 2d 436, 155 N.E.2d 545.) Courts will generally not interfere with contracts to which parties have agreed unless there existed, at the time the contract was formed, a defect in the negotiation process. (*Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.* (1980), 86 Ill. App. 3d 980, 408 N.E.2d 403). Such defects include disparity in bargaining power (*McClure Engineering Associates, Inc. v. Reuben Donnelley Corp.* (1981), 101 Ill. App. 3d 1109, 428 N.E.2d 1151), the absence of meaningful choice on the part of one party (*In re Marriage of Carlson* (1981), 101 Ill. App. 3d 924, 428 N.E.2d 1005), and the existence of fraud, duress, or mistake (*Neal v. Lacob* (1975), 31 Ill. App. 3d 137, 334 N.E.2d 435.) Absent any such defect, however, a contract will be enforced as written and a court will not set aside a contract merely because that agreement later turns out to be a bad bargain for one of the parties. *Dillman & Associates, Inc. v. Capitol Leasing Co.* (1982), 110 Ill. App. 3d 335, 442 N.E.2d 311.

■ Applying the above-cited principles to the case at bar, we find that the evidence presented at trial supports the trial court's ruling

that the instant lease resulted from an arm's-length bargain between Pekin and Keystone. As stated previously, Louis Cole's uncontradicted testimony is the only evidence addressing the bargaining process that occurred between him and Pekin. Cole testified that he and Pekin mutually negotiated all of the provisions of the lease, including its term, the amount of rent, and the renewal option. Because that is the only evidence of the lease's formation process, we agree with the trial court that the Association has failed to prove that the lease was a result of unconscionable influences.

The Association claims, however, that we should infer that Cole and Pekin were in collusion together "to create a long term agreement which would oppress unwitting future owners or successors." Whether this claim is true or not, we are bound by a record that contains no evidence of any such collusion between Pekin and Cole. While we agree with the Association that such collusion, had it existed, would probably render the lease unconscionable, nevertheless, the record is devoid of any evidence suggesting that the instant lease resulted from anything less than fair bargaining. Consequently, we believe that the trial court, based on the evidence before it, was correct in finding that the present lease was not unconscionable.

■ With regard to Keystone's lease renewal option, on the other hand, we find that the trial court erred in holding that it was unconscionable. Although the renewal option may force the Association to comply with an agreement that is economically disadvantageous, nevertheless, there is simply no evidence in the record which suggests that Keystone obtained the renewal option through unconscionable means. We again stress that the testimony of Cole is the only evidence disclosing the bargaining process which ultimately resulted in the instant lease being executed. Under that circumstance, we believe that the trial court's decision finding the lease renewal option to be unconscionable was, based on the record before it, contrary to the manifest weight of the evidence. *Greer v. Carter Oil Co.* (1940), 373 Ill. 168, 25 N.E.2d 805.

## II

■ We next address the Association's claim that the trial court erred in finding that Dana Point residents had constructive notice of the Keystone lease at the time they purchased their condominium units. As the Association correctly points out, Keystone failed to properly record the lease pursuant to section 28 of "An Act concerning conveyances" (Ill. Rev. Stat. 1981, ch. 30, par. 27). However, it is well settled that the actual occupation of property is equivalent to the

recording of the instrument under which the occupant is claiming an interest. (*Beals v. Cryer* (1981), 99 Ill. App. 3d 842, 426 N.E.2d 253; *Burnex Oil Co. v. Floyd* (1969), 106 Ill. App. 2d 16, 245 N.E.2d 539.) Where property is occupied by someone other than the record owner, a prospective purchaser is charged with constructive notice of all facts which a reasonable inquiry would have disclosed. *Weiman v. Butterman* (1970), 124 Ill. App. 2d 246, 260 N.E.2d 321.

In the case at bar, Louis and David Cole both testified that they had placed signs and stickers on the machines and walls of the laundry rooms at Dana Point. These signs identified Keystone as being the owner of the machines and suggested that in the event of a problem, Keystone was to be contacted. According to the Coles, these signs were affixed to the machines and walls during the period in which the Dana Point condominiums were being sold. The placing of signs which identify an occupant different than that of the record owner has been found to be sufficient to place a prospective purchaser on inquiry notice. (See *Weiman v. Butterman* (1970), 124 Ill. App. 2d 246, 260 N.E.2d 312.) In the case at bar, such inquiry would have led a prospective Dana Point condominium purchaser to discover the Keystone lease.

■ We are aware that the testimony of the Dana Point residents contradicts that of the Coles. However, the trial court is in a superior position to observe witnesses and evaluate testimony, and we will not abandon its findings unless they are contrary to the manifest weight of the evidence. (*In re Marriage of Smith* (1980), 90 Ill. App. 3d 168, 412 N.E.2d 985.) In the present case, there is evidence in the record which supports the trial court's decision. Therefore, we will not disturb the trial court's ruling with regard to the constructive notice issue.

Accordingly, for the reasons set forth above, we affirm the trial court's ruling as to the validity of the basic lease, but reverse its ruling as to the option right. We find the option right legally binding and enforceable.

Affirmed in part, reversed in part.

JIGANTI and JOHNSON, JJ., concur.