1-95-3053

CITY OF CHICAGO, ) APPEAL FROM THE
 ) CIRCUIT COURT OF
 Plaintiff-Appellee, ) COOK COUNTY
 )
 v. )
 ) No. 94 CH 2064
CHICAGO FIBER OPTIC CORPORATION, ) 
d/b/a METROPOLITAN FIBER SYSTEMS )
OF CHICAGO, INC., ) THE HONORABLE
 ) ALBERT GREEN
 Defendant-Appellant. ) JUDGE PRESIDING.


 PRESIDING JUSTICE COUSINS delivered the opinion of the 

court:

 The plaintiff, City of Chicago (the City) filed a
declaratory judgment against the defendant, Chicago Fiber Optic
Corp. d/b/a Metropolitan Fiber Systems of Chicago, Inc. (MFS),
seeking a declaration that a contract between the City and MFS
was enforceable. MFS filed a counterclaim against the City,
seeking a declaration to the contrary. The contract arose out of
an ordinance that permits MFS to run fiber optic cable for its
telecommunications network under the City streets. The City
imposed a franchise fee on MFS in return for MFS's use of the
public ways and the City's freight tunnel system to place the
fiber optic cables. MFS argued that the contract was void
because it violated the public policy expressed by the Illinois
Supreme Court in American Telephone & Telegraph Co. v. Village of
Arlington Heights, 156 Ill. 2d 399, 620 N.E.2d 1040
(1993)(hereinafter AT&T). The parties filed cross-motions for
summary judgment. The trial court granted the City's motion and
denied MFS's. On appeal, MFS contends that: (1) the City's
franchise fee is illegal under AT&T and is unenforceable as a
violation on public policy; (2) the trial court misinterpreted
AT&T and ignored the breadth of the supreme court's holding in
that case; and (3) the City is barred from denying the illegality
of its franchise fee based on issue preclusion.
BACKGROUND
 MFS is a telecommunications company that serves customers
within the Chicago area. On March 12, 1986, MFS entered a
contract with the City, agreeing to pay the City a franchise fee
in return for its use of the City's public ways and freight
tunnel system to provide telephone service within the City of
Chicago. The contract required MFS to pay the "greater of" a
minimum annual fee (set at $30,661), a "capacity based fee"
(calculated based upon the number of lineal feet of MFS's fiber
optic cable in the public way), or 8% of "the annual gross
billings of MFS for the provision of telecommunications services
or facilities in the City of Chicago, with deductions for city
transaction or utility taxes on those billings. The city council
approved the contract and embodied the contract in an ordinance. 
The ordinance recites that the City wished to grant a franchise
to MFS "to facilitate the development of a competitive fiber
optic telecommunications industry serving the City of Chicago."
 Pursuant to the contract, MFS placed fiber optic
telecommunications cables in the public ways and freight tunnels
owned by the City. Since then, MFS has provided telephone
service to customers within Chicago. MFS provides nonswitched
private line and access telecommunications services within the
Chicago area in competition with the principal local exchange
carriers, Ameritech and Centel Telephone Company. Most of MFS's
services involve interstate and international communications. 
 In 1993, MFS requested an amendment of the 1986 contract to
extend the geographic area within the City in which MFS was
permitted to use the public ways. On October 7, 1993, the city
council passed an amended ordinance embodying the contract
modifications. Under the contract, the City provides various
services, including inspection and maintenance, related to the
safe use of the public ways and freight tunnel system. MFS, in
turn, is required to pay the City either the minimum fee or the
specified percentage of its gross billings in Chicago and to
maintain an insurance bond in the amount of $5 million.
 MFS complied with the terms of the contract from March 12,
1986 through February 14, 1994. In July 1992, MFS asserted its
option under the contract to begin paying 3% of its gross
billings to Chicago residents if that figure exceeded the minimum
fee called for by the contract. In October 1993, MFS began
paying a fee equalling 3% of its monthly gross billings in
Chicago instead of the minimum fee. 
 In 1993, MFS decided to stop paying the City's fee based on
two decisions: American Telephone & Telegraph Co. v. Village of
Arlington Heights, 156 Ill. 2d 399, 620 N.E.2d 1040 (1993), and
Diginet, Inc. v. Western Union ATS, Inc., 958 F.2d 1388 (7th Cir.
1992); on remand, 845 F. Supp. 1234 (N.D. Ill. 1993); vacated,
845 F. Supp. 1237 (N.D. Ill. 1994). The cases held, in essence,
that a city does not have a proprietary interest in the its
public streets, but only a regulatory interest. Therefore, a
municipality cannot charge a rental fee for the use of its public
streets. MFS asserted that the City was obligated to provide MFS
with access to and the use and maintenance of the public ways and
that MFS was not obligated to pay the fee under the contract.
 The City filed an action against MFS for declaratory
judgment and other relief. MFS filed a five-count counterclaim
against the City. The City later moved to dismiss all the counts
of its complaint except the one seeking declaratory relief. The
trial court granted the motion. The City filed a motion for
summary judgment, seeking declaratory judgment against MFS. MFS
opposed the motion and filed its own motion for partial summary
judgment against the City on two of the counts of its
counterclaim. After briefing and argument, the circuit court
found that MFS had breached its contract with the City and
granted the City's motion for summary judgment. The court denied
MFS's motion for partial summary judgment. MFS appeals. 
 We affirm. 
ANALYSIS
 I
 Initially, we note that this appeal was taken from the trial
court's order granting summary judgment in favor of the City on
the issue of whether the franchise fee imposed on MFS was
enforceable. In an appeal from the grant of summary judgment, we
conduct a de novo review. Outboard Marine Corp. v. Liberty
Mutual Insurance Co., 154 Ill. 2d 90, 102, 607 N.E.2d 1204
(1992). Although summary judgment is a drastic means of
disposing of litigation, it is an appropriate measure in cases
where there are no genuine issues of material fact and the moving
party is entitled to judgment as a matter of law. Crum Forster
Corp. v. Resolution Trust Corp., 156 Ill. 2d 384, 620 N.E.2d 1073
(1993). The right of the moving party must be free and clear
from doubt, and all evidence in the record must be construed
strictly against the movant and liberally in favor of the
opponent. Purtill v. Hess, 111 Ill. 2d 229, 489 N.E.2d 867
(1986); Wagener v. Papie, 242 Ill. App. 3d 354, 609 N.E.2d 951
(1993).
 MFS first contends that the City's franchise fee is illegal
under the Illinois Supreme Court's holding in American Telephone
& Telegraph Co. v. Village of Arlington Heights, 156 Ill. 2d 399,
620 N.E.2d 1040 (1993). In AT&T, the American Telephone &
Telegraph Co., and AT&T Communications of Illinois, Inc.
(collectively referred as AT&T), wished to lay fiber optic cables
between Glenview and Rockford and acquired a right-of-way under a
railbed from a railroad company. Because the railbed passed over
public streets, AT&T also sought the right to pass under the
streets of several suburban communities that intersected the
railbed. Those communities refused to allow AT&T to lay the
cable unless it agreed to enter into a franchise agreement with
each community. AT&T refused to enter into any franchise
agreement, therefore, the communities refused to issue permits to
AT&T. AT&T filed a complaint against the defendant
municipalities and sought a preliminary injunction to prevent
their future interference in the installation of the fiber optic
cable under the streets. The trial court granted AT&T's
preliminary injunction, and later entered a permanent injunction
on AT&T's behalf, which the appellate court affirmed. In
affirming the appellate court, the supreme court noted that
"[w]hile municipalities have the authority to enact regulations
relating to the use of the public streets and to charge
reasonable regulatory fees for such use, they do not have the
authority to hold the public streets hostage as a means of
raising revenue [citation]." AT&T, 156 Ill. 2d at 407-08. The
court stated that the defendant municipalities had attempted to
circumvent the statutory requirement that the taxing of a
telecommunications company must be based upon the business
originating within the corporate limits of the municipality. 
Because no person or entity within any of the municipalities was
to be connected to or have the use of the fiber optic cable, all
that AT&T sought was "to get from one side of town to the other." 
AT&T, 156 Ill. 2d at 408. The court concluded that the so-called
franchise fee was, therefore, nothing more than an impermissible
"toll." AT&T, 156 Ill. 2d at 408.
 MFS also relies on a federal case, Diginet, Inc. v. Western
Union ATS, Inc., 845 F. Supp. 1234 (N.D. Ill. 1993). In Diginet,
Western Union ATS, Inc. (ATS) leased fiber optic circuits that
were located under the streets of the City of Chicago. ATS
refused to pay the franchise fee that the City imposed. The City
filed a cross-claim to restrain ATS from expanding its circuits
without a franchise from the City. The district court granted
the City a preliminary injunction. The Court of Appeals for the
Seventh Circuit reversed and remanded, holding that the franchise
fee that the City sought to impose was not a proper regulatory
fee, but an improper tax. Diginet, 958 F.2d 1388. While the
Diginet case was before the Court of Appeals for the Seventh
Circuit, the AT&T case was pending before the Illinois Supreme
Court. In remanding the case to the district court, the court of
appeals instructed that final disposition of the case take into
account the decision of the Illinois Supreme Court in AT&T. 
 On remand, the City attempted to distinguish AT&T on the
basis that ATS sought to serve customers by extensions within the
city, instead of attempting to get from one side of the town to
the other. The district court rejected this distinction, stating
that the City's position overlooked the rationale of the supreme
court's opinion that municipalities do not possess proprietary
powers over the public streets. They only possess regulatory
powers. Accordingly, the court held that the City did not have
the right to condition street access to fiber optic cables on
payment of franchise fees. Diginet, 845 F. Supp. at 1236.
 MFS argues that the franchise fee in the instant case is
similar to the fee in AT&T because the City requires that MFS pay
a percentage of its gross revenues for the privilege of placing
fiber optic cable underneath the city streets. MFS asserts that
this is exactly the type of "toll" prohibited in AT&T. We
disagree. Unlike the municipalities in AT&T, the business that
MFS seeks to establish, i.e. its telecommunication system,
originates within the Chicago area. The City is not seeking to
exact a "toll" or garner revenue from the use of city streets. 
But, rather, MFS is engaging in a franchise-type business seeking
protection, licensing and special privileges for the use of the
City's streets. See AT&T, 156 Ill. 2d at 408. In this regard,
the franchise fee in the instant case differs from AT&T. 
 We note that Justice Freeman's special concurrence in AT&T
states that his agreement with the majority opinion was limited
to the facts of that case because there was too little to tie
AT&T to the municipalities by virtue of the particular presence
of cable to justify amounting to rent. He further stated:
 "I am reluctant, however, to preclude the possibility 
 that different circumstances could justify the types of fees
 sought to be imposed here. The closer a private entity is 
 joined, economically speaking, to a municipality through 
 use of municipal property, the stronger the argument for
 fees amounting to rent becomes." AT&T, 156 Ill. 2d at 415
 (Freeman, J., specially concurring.)
 MFS also contends that the franchise agreement violates the
policy of the State to encourage the growth of competitive
telecommunication services like those offered by MFS. MFS refers
to the legislative findings of the Illinois Universal Telephone
Service Protection Act (the Act) that states in pertinent part:
 "(a) universally available and widely affordable 
 telecommunication services are essential to the health,
 welfare and prosperity of all Illinois citizens
 * * *
 (c) the competitive offering of telecommunications
 services may create the potential for increased innovation
 and efficiency in the provision of telecommunications
 services and reduced prices for consumers[.]" 220 ILCS
 5/13-102(a),(c) (West 1992)
The Act further declares as State policy that:
 "(a) telecommunications services should be available to
 all Illinois citizens at just, reasonable and affordable
 rates and that such services should be provided as widely
 and economically as possible in sufficient variety, quality,
 quantity and reliability to satisfy the public interest;
 * * *
 (f) development of and prudent investment in advanced 
 telecommunications networks that foster economic 
development of the State should be encouraged." 220 
ILCS 5/13-103(a),(f) (West 1992).
 MFS states that allowing the City to continue to tax
telecommunications companies that entered into agreements with
it, rather than be excluded from the Chicago market, contravenes
these express legislative statements of Illinois public policy. 
We disagree. Public policy, a principle of law which declares
that no one may lawfully do that which has a tendency to be
injurious to the public welfare, is found in our constitution,
statutes and judicial decisions. McClure Engineering Associates,
Inc. v. Reuben H. Donnelley Corp., 95 Ill. 2d 68, 71-72, 447
N.E.2d 400 (1983). Public policy strongly favors the freedom to
contract. McClure Engineering, 95 Ill. 2d at 72. In fact, where
a contract is illegal or against public policy, a court will not,
at the urging of one of the parties, set it aside after it has
been executed, because to give such relief would injure and
counteract the public good. Telenois, Inc. v. Village of
Schaumburg, 256 Ill. App. 3d 897, 903, 628 N.E.2d 581 (1993).
 With respect to home-rule units, the method by which the
City procures its contracts is a matter of local concern. See
American Health Care Providers, Inc. v. County of Cook, 265 Ill.
App. 3d 919, 926, 638 N.E.2d 772 (1994). However, State
legislation always prevails when it expressed the intent to be
exclusive and to preclude local regulation. Otherwise, home-rule
units retain the power to act concurrently and are left free to
complement the state activity. American Health, 265 Ill. App. 3d
at 927. However, legislation passed by the General Assembly must
contain express language that the area covered by the legislation
is to be exclusively controlled by the State, it is not enough
that the State comprehensively regulates an area which otherwise
would fall into home rule power. American Health, 265 Ill. App.
3d at 928; Village of Bolingbrook v. Citizens Utilities Co., 158
Ill. 2d 133, 138, 632 N.E.2d 1000 (1994). 
 In the instant case, although the Act sets forth its purpose
and policy, the Act does not preclude contractual agreements
between telephone companies and municipalities and does not
expressly or impliedly contain language that franchise fee
arrangements are exclusively controlled by the State. Our
holding reinforces a long-standing tradition in regards to home-
rule units and its powers to contract. In City of Springfield v.
Inter-State Independent Telephone & Telegraph Co., 279 Ill. 324,
116 N.E. 631 (1917), our supreme court held that an ordinance
authorizing a telephone company to place its equipment on the
public ways if it paid a fee was not beyond the scope of
municipal power. The court stated that the franchise ordinance,
upon its acceptance and the construction of the system of
telephones, became a contract the terms of which were binding
upon the city and the telephone company and could not be varied
by either without the consent of the other. City of Springfield,
279 Ill. at 327; See Village of West City v. Illinois Commercial
Telephone Co, 372 Ill. 493, 24 N.E.2d 352 (1939).
 II
 MFS next contends that the trial court misinterpreted AT&T
and ignored the breadth of the supreme court's holding in that
case by relying on dicta from AT&T: 
 "While AT&T and the defendant municipalities could have
 voluntarily entered into a contractual relationship under 
 which AT&T would have agreed to pay for the undercrossing of
 public streets, absent such an agreement, defendants do not
 have the right to force AT&T to pay a toll under the guise 
 of a franchise agreement. Additionally, it is immaterial 
 that the defendants have been able to coerce other companies
 into similar agreements or that AT&T has been coerced into 
 such agreements in the past." (Emphasis added.) Arlington 
 Heights, 156 Ill. 2d at 413.
 We disagree with MFS. In our opinion, the primary reason why
the AT&T decision is not controlling in the instant case is that
the City here seeks to enforce the franchise fee based on
contract. This language from AT&T with which MFS finds fault
underscores the weakness of the MFS argument. The contention by
MFS that this language in AT&T is dicta and doesn't mean what it
seems to mean is not compelling. In our view, this language is
in derogation of the contention of MFS that the AT&T holding bars
the enforcement of franchise fees by municipalities for the use
of public ways by fiber optic companies in contractual as well as
non-contractual arrangements between the parties. 
 MFS next asserts that the trial court erroneously concluded
that the 1986 ordinance was a voluntary agreement exempt from the
supreme court's prohibition against revenue-raising fees. MFS
argues that, in light of the supreme court's holding that
municipalities may not use their power over the public ways to
impose revenue raising fees, franchise agreements are forced
rather than voluntarily entered. MFS contends, therefore, that
the 1986 agreement was not voluntary because MFS could either pay
the revenue or forfeit doing business in the Chicago market.
 Courts will generally not interfere with contracts to which
parties have agreed unless there existed, at the time the
contract was formed, a defect in the negotiation process. Dana
Point Condominium Ass'n., Inc. v. Keystone Service Co., a
Division of Cole Coin Operated Laundry Equipment, Inc., 141 Ill.
App. 3d 916, 920, 491 N.E.2d 63 (1986). Such defects include
disparity in bargaining power, the absence of meaningful choice
on the part of one party, and the existence of fraud, duress, or
mistake. Dana Point, 141 Ill. App. 3d at 920. Absent any such
defect, however, a contract will be enforced as written and a
court will not set aside a contract merely because that agreement
later turns out to be a bad bargain for one of the parties. Dana
Point, 141 Ill. App. 3d at 920. 
 In the instant case, the first MFS-City ordinance was
adopted in 1984. The City increased the fees later that year. 
Subsequently, MFS entered into another agreement with the City in
1986. There is no indication that, at the time that MFS entered
into an agreement with the City in 1986, MFS was coerced or
entered the agreement under duress. MFS voluntarily agreed to
pay the higher fees in order to do business in Chicago. As a
competent party to the negotiation, we believe that MFS was aware
of the business risks and, therefore, should stand by their own
agreement. See McClure, 95 Ill. 2d at 72-73.
 MFS also argues that the court implicitly found that MFS
waived its right to object to paying the fee by signing the 1993
ordinance modification two months after AT&T was decided. 
However, in viewing the trial court's finding, we do not believe
that the trial court based its decision on the timing of the
agreement. Rather, we believe that the trial court based its
finding on the fact that MFS had signed a contractual agreement
to pay the franchise fee and MFS had breached this contract by
its failure to pay. Unlike the AT&T Company in the AT&T case,
MFS chose to sign an agreement to pay the franchise fee. 
 MFS also argues that it never intended to waive any rights
with the 1993 modification. Waiver is an intentional
relinquishment of a known right. Greene v. Helis, 252 Ill. App.
3d 957, 962, 625 N.E. 162 (1993). It may be accomplished by
express agreement or may be implied from a party's conduct. 
Greene, 252 Ill. App. 3d at 962; Crum, 156 Ill. 2d at 396. The