ROBERT NEAL, Plaintiff and Counterdefendant-Appellee, *v.* SEYMOUR LACOB, Defendant and Counterplaintiff-Appellant.

(No. 61504; ▮▮▮▮▮▮▮▮▮▮

First District (5th Division)—July 25, 1975.

Seymour Lacob, *pro se.*

Cummings & Wyman, of Chicago (Daniel P. Nagle, of counsel), for appellee.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Plaintiff brought this action seeking rescission of a contract. Defendant counterclaimed, seeking an accounting and money damages. The trial court found that the contract was unconscionable and consequently held that it "should be declared null and void" and that the counterclaim should be dismissed for want of equity. It is defendant's basic contention on appeal that the court's finding of unconscionability is unsupported by the record.

In September 1967 plaintiff, an automobile dealer, entered into the contract which is the subject matter of this dispute. In consideration for lending plaintiff $5000 and guaranteeing a $15,000 line of credit at the Independence Bank of Chicago, it was agreed:

"1. That ROBERT NEAL so long as he continues to engage either directly or indirectly by his agents or servants in the business of selling automobiles either by way of corporations or individually or partnership agrees to furnish SEYMOUR LACOB a new JAGUAR automobile for his use at no expense to SEYMOUR LACOB; said auto to be returned to ROBERT NEAL each fall.

2. That in the event that SEYMOUR LACOB is not available to take delivery of said automobile (JAGUAR) then ROBERT NEAL is to furnish said auto to SEYMOUR LACOB'S family.

3. That ROBERT NEAL is to pay SEYMOUR LACOB his assigns, agents or family the sum of TWENTY FIVE DOLLARS ($25.00) for each new automobile as floor planned & guaranteed sold by said ROBERT NEAL or his agents; in the event that said

ROBERT NEAL ceases selling new automobiles then the sum of $25.00 to be paid as directed for the sale of used automobiles sold. 4. That provision number 3 shall remain in effect so long as ROBERT NEAL either directly or indirectly remains in the business of selling autos.

5. That ROBERT NEAL shall proceed to pay the FIVE THOUSAND DOLLARS indebtedness commencing OCTOBER 1, 1968 at the rate of $400.00 per month until paid in full.

6. That the aforementioned loans shall be secured by ROBERT NEAL by liens on all autos presently owned by ROBERT NEAL; said loan further secured by all furniture, tools and assets concurrently situated at COMPETITION MOTORS, LTD., 7729 S. Cottage Grove Ave, Chicago, Illinois."

It is undisputed that from 1967 until the end of 1971, plaintiff, with only minor variations, agreed to by defendant, performed his obligations under the contract. On May 1, 1973, plaintiff filed his complaint seeking rescission of the contract. His action was predicated on the allegation that the contract was "unconscionable, usurious and inequitable." Defendant filed a counterclaim which alleged that the contract was in actuality a "joint-venture agreement" and that he was entitled to an accounting and money judgment.

At trial plaintiff testified in his own behalf that he is the president of Bob Neal Pontiac-Toyota, an automobile dealership located in Chicago. At the time of trial he was 41 years old and had been in the automobile business for 13 years. Prior to his entry into the automobile business, he had been a teacher in the Chicago School System for 6 years. He holds a college degree. Plaintiff first met defendant in June 1967 when, pursuant to an "oral proposition," he delivered a Jaguar Roadster sports car to defendant's home. It was plaintiff's proposal that if defendant loaned him $7000 at 10% interest, he would give defendant use of the car. Defendant told him that he would think about it. In September 1967 plaintiff was invited to defendant's home. Defendant informed him that he had a counterproposal which he thought would be acceptable. Defendant then typed up the instrument which is the subject matter of the instant case. Although it was not what plaintiff had in mind, "it appeared to be satisfactory." When he read the contract, plaintiff pointed out to defendant that he wanted defendant to "participate in profits of new cars sold [only] insofar as they were guaranteed and floor planned by him." Defendant agreed and in longhand added to paragraph 3 of the contract, which required that $25 be paid to him for

"each new car sold by" plaintiff, the words "as floor planned & guaranteed." *

Plaintiff spent 3 to 5 minutes reading the contract and then signed it. He knew that defendant was an attorney. Defendant had not done any legal work for him prior to the execution of the contract. Subsequent to plaintiff's signing the contract, defendant on occasion handled some legal matters for him. Defendant did not bill him for these services. Defendant lent him $5000 which he repaid with interest. In October 1967 defendant submitted to Independence National Bank "documentation" to guarantee for plaintiff a $15,000 line of credit. This line of credit was terminated 2½ years later. Subsequent to October 1967 plaintiff applied for and received, without benefit of defendant's guarantee, an additional line of credit. In May 1968 plaintiff delivered to defendant a new Jaguar which defendant returned in September of that year. Again in the spring of 1969 he delivered to defendant a Jaguar which was returned in the fall. In 1970 and 1971 he delivered new Triumph TR-6 Convertibles to defendant. In 1972 he delivered a TVR two-seater sports car. Title for all these cars remained with plaintiff while they were in the possession of defendant.

Plaintiff did not learn that defendant was contending that he was a "joint-venturer" until the filing of the counterclaim. Defendant never asked to share in the profits and losses of the business.

On cross-examination plaintiff testified that prior to signing the contract he had several telephone conversations with defendant during which the possibility of defendant guaranteeing a $15,000 line of credit was discussed. Defendant had originally contacted him in response to a 1967 newspaper advertisement for the sale of a Jaguar automobile. During the course of their discussions, plaintiff told defendant that without a guarantor the Independence National Bank would not extend him a line of credit. With a line of credit from the bank he could carry a larger inventory of cars. Plaintiff was satisfied with the contract when he signed it. He entered into it "willingly." At that time he did not think it was

---

* In Beutel, Bank Officers Handbook of Commercial Banking Law § 15—25, at 199 (4th ed. 1974), the following discussion of "floor plan financing" appears:

"Sometimes, when the debtor is a merchant or manufacturer who intends to sell the goods the bank or other creditor is financing, the creditor allows the goods so securing the loan to be placed in the inventory of the debtor or displayed for sale. The contract of security may provide that, as goods are to be sold and replaced, the replacements are to become part of the security. This so-called floor plan financing offers very precarious security to the lender, because if the goods are sold in the ordinary course of business or come into the hands of a person who gives new value for them, the security interest is cut off in his favor. This is true even if the buyer knows of the security interest."

unfair that he would be required to furnish defendant or defendant's family a Jaguar for as long as he remained in the business of selling automobiles. The cars were delivered in the spring and returned by defendant in the fall. Plaintiff was able to sell the cars used by defendant. It is "possible" that he made a profit on these sales. In 1968 defendant lent him $3000. He repaid the loan. Plaintiff "lived up" to the contract until 1972. He stopped making payments to defendant of $25 for every car sold because he was under the impression that after he stopped dealing with the Independence Bank he was not required to do so. In 1967 plaintiff's net worth was $22,000; ** at the time of trial it was $60,000 or $70,000.

On redirect examination plaintiff testified that he paid defendant $25 for the sale of each of 163 new cars.

Sarah Lacob, defendant's wife, testified on his behalf that he first contacted plaintiff in response to a newspaper advertisement regarding the sale of a Jaguar automobile. She was present in September 1967 when defendant typed up the contract. Plaintiff and his wife were also present. Plaintiff suggested the handwritten amendment to paragraph 3. In 1967 she had occasion to visit plaintiff's place of business. She saw no new cars there nor did she see any sales personnel, mechanics or office help.

Defendant testified on his own behalf that he first contacted plaintiff in response to a newspaper advertisement. Plaintiff drove the Jaguar to defendant's home for him to inspect. At that time plaintiff proposed that if defendant would lend him some money to go into business, defendant could have use of the car. Defendant, at plaintiff's invitation, went to plaintiff's place of business to continue these negotiations. He did not see any new cars there nor did he see any employees. Plaintiff proposed that defendant go with him to the Independence Bank to guarantee a line of credit so plaintiff "could get a Toyota line." Plaintiff agreed to make a new Jaguar available to defendant and his family "every year [plaintiff] was in business" if defendant would assist him in acquiring a Toyota line. During these negotiations plaintiff offered him "a share of the business" if defendant would assist him in getting a $15,000 line of credit. Defendant responded to this proposal, "I don't want a share of your business, however, I would be interested in being a sort of silent partner * * *." The contract that was agreed upon was worded to incorporate defendant's desire "to be paid for every car that was sold by virtue of [his] guarantee." As other good and valuable consideration, defendant agreed to provide his legal services to assist in the operation

---

** We note that among the exhibits introduced below was plaintiff's profit and loss statement for April 1967 which indicates he made a net profit of $97.17.

of the business. During "the latter part of 1972" plaintiff informed defendant that while he no longer intended to pay him $25 for every new car sold, he would comply with "the Jaguar provision of the contract."

OPINION

Defendant contends that the trial court erred in finding the contract to be "unconscionable." He argues that the contract was a valid joint venture agreement between himself and plaintiff under which plaintiff was obligated to supply him or his family with a new Jaguar every year and pay $25 for each new car sold for as long as plaintiff remained in the business of selling automobiles. Plaintiff counters that defendant, taking advantage of their friendship and his position as an attorney, lured him into signing the contract. He argues that defendant's consideration was miniscule in relation to the benefits he derived under the contract.

■ ■■ Traditionally an unconscionable bargain has been defined as one "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other * * *." (*Hume v. United States* (1889), 132 U.S. 406, 410.) The term is used to signify a contract that is improvident, totally one-sided or oppressive. (See Annot., 18 A.L.R.3d 1305, 1306 (1968).) Where a contract is found to be unconscionable, courts will refuse to give full effect to it as written. (See *Williams v. Walker-Thomas Furniture Co.* (1965), 121 U.S. App. D.C. 315, 350 F.2d 445.) In the context of dealings between businessmen, the unconscionability doctrine has been applied to protect those in need of goods of services from being overreached by others who have the power to drive hard bargains. (*Cf. Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 91.) However, it is to be noted that in the absence of fraud, mistake or duress, courts are reluctant to strike down contracts for "[p]eople should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain." *Carlson v. Hamilton*, 8 Utah 2d 272, 274, 332 P.2d 989.

■■ We believe that in determining whether a contract such as the one here at issue is unconscionable, such factors as the age and education of the contracting parties, their commercial experience and their relative bargaining positions should be considered. In the instant case the record reveals that plaintiff was a college graduate. He was almost 40 years of age at the time the contract was signed and had been in the automobile business for a number of years. The contract was drafted by defendant only after he had several discussions with plaintiff regarding plaintiff's need of capital to expand his business. After negotiating a

modification of the typewritten proposal prepared by defendant in September 1967, plaintiff "willingly" signed it. He testified that the contract "appeared to be satisfactory." Plaintiff fulfilled his obligations under the contract, without complaint, for several years. It does not appear that defendant lured plaintiff into signing the contract by taking advantage of an attorney-client relationship; the evidence seems clear that at the time the contract was signed, no such relationship existed between the parties. Although plaintiff was aware that defendant was an attorney, the negotiations leading up to the signing of the contract were conducted at arm's length. Moreover, we note that while it appears that subsequent to the signing of the contract, plaintiff developed a substantial automobile dealership, in 1967 plaintiff's business was a veritable "shoestring operation." Nevertheless, the record demonstrates that defendant risked $20,000, a cash loan of $5000 and a guarantee of a $15,000 line of credit on the hope that plaintiff's business would be a success. Clearly, then, defendant's consideration under the contract was substantial. On the basis of this record we must reverse the trial court's holding that the contract was "unconscionable."

■■ Although we agree with defendant's contention that the contract was not unconscionable, we cannot agree with his claim that it created a joint venture relationship between himself and plaintiff. In *Electrical Contractors, Inc. v. Goldberg & O'Brien Electric Co.*, 29 Ill.App.3d 819, our court recently had occasion to examine the nature of the joint venture relationship:

> "[T]o constitute a joint venture, there must be a community of interest and the right to joint control. (*Finn v. Drtina* (1948), 30 Wash.2d 814, 194 P.2d 347; 46 Am.Jur.2d Joint Ventures § 12.) Some courts have said that the most important criterion of a joint venture is joint control and management of the property used in accomplishing its aims. (*Detachable Bit Co. v. Timken Roller Bearing Co.* (6th Cir. 1943), 133 F.2d 632, 635; *Chisholm v. Gilmer* (4th Cir. 1936), 81 F.2d 120.) In fact, one court went to the extent of saying that '* * * there can be no joint venture or common enterprise of legal important unless there be a community of interest in the objects or purposes of the undertaking, and an equal right to direct and govern the movements and conduct of each other in respect thereto.' (*Crutti v. Frank* (La. App. 1962), 146 So.2d 474, 479.) Another has pointed out that '[w]here the right to control is lacking, a joint enterprise does not exist.' *Bainbrich v. Wells* (Colo. App. 1970), 476 P.2d 53, 54." 29 Ill.App. 3d 819, 823.

In the case at bar the written contract contains no hint that the parties

intended defendant to have any right to exercise control or management over the conduct of plaintiff's automobile dealership. The record is manifest that defendant never attempted to assert such a right. Plainly, then, defendant is not a joint venturer in plaintiff's business.

■■ As we have indicated above, it is our view of the instant contract that it is neither an unconscionable bargain unenforceable against plaintiff, nor is it a joint venture agreement giving defendant a perpetual right to a share of the profits of plaintiff's business. Rather, guided by the recent decision in *Keeshin v. Levin*, 31 Ill.App.3d 790, which cited 17 Am.Jur.2d *Contracts* § 325, we have analyzed the intent of the parties "by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference and by the circumstances of the particular transaction giving rise to the question" and hold that the instant contract contains two severable provisions, one of which has terminated, the other remaining in force. Essentially the contract here provided that in return for a $5000 loan and a guarantee of a $15,000 line of credit at the Independence Bank of Chicago, plaintiff agreed to provide defendant or his family with the use of a new Jaguar every year he remained in the automobile business and, in addition, $25 for each new car sold "as floor planned and guaranteed * * * by [defendant]." These provisions are severable. Our view is reinforced by an examination of the record in its entirety. It reveals that plaintiff was anxious to expand the scope of his operation. In order to do so he needed to obtain a line of credit from a bank. Apparently he could not obtain such a line of credit unless it was guaranteed by a third party. Defendant proposed that he provide such a guarantee if plaintiff agreed to pay him $25 for each new car plaintiff sold. At plaintiff's insistence this provision was limited to cars sold *"by virtue of defendant's guarantee"* of plaintiff's line of credit at the Independence Bank of Chicago. When this line of credit was terminated, it was the intent of the parties that defendant's right to $25 for each new car sold would end. The parties in addition also agreed that defendant or his family would be given the use of a new Jaguar every year for enabling plaintiff to expand his inventory of new cars. Thus, while the provision calling for $25 to be paid defendant for each new car sold ended when plaintiff terminated his line of credit guaranteed by defendant at the Independence Bank, plaintiff's obligation to provide defendant with the use of a new Jaguar continues to run.

Accordingly we reverse the judgment entered below and remand the cause with directions that a judgment be entered finding (1) the provision of the contract that $25 be paid to defendant for each new car

sold by plaintiff by virtue of the floor plan financing guaranteed by defendant's $15,000 (paragraphs 3 and 4 thereof) is of no further force and effect, and (2) the provision of the contract that defendant be provided with the use of a new automobile from spring to fall (paragraphs 1 and 2 thereof) is in full force and effect; and that a hearing be granted on defendant's counterclaim to determine the fair rental value of a new automobile for that period of time during which defendant was not provided with the use of a car by plaintiff.

Reversed and remanded with directions.

LORENZ and SULLIVAN, JJ., concur.