POTOMAC LEASING COMPANY, Plaintiff-Appellant, v. CHUCK'S PUB, INC., *et al.*, Defendants-Appellees.

Second District   No. 2—86—0025

Opinion filed June 12, 1987.

REINHARD, J., specially concurring.

Charmaine E. Dwyer, of Franks & Filler, of Marengo, for appellant.

Cynthia J. Briscoe, of Madsen & Briscoe, of Crystal Lake, for appellees.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, Potomac Leasing Company (PLC), filed suit against defendants, Chuck's Pub, Inc., and Charles H. Lumb, to enforce a commercial lease agreement. Defendants' motion for summary judgement was granted. Plaintiff's motion to reconsider was denied. This appeal followed. Because we find the issue concerning the governing law to be dispositive in favor of plaintiff, we need not address the remaining contentions of the parties.

On August 27, 1984, PLC, a foreign corporation with its principal place of business in Michigan, entered into a commercial lease agreement with Chuck's Pub, an Illinois corporation with its principal place of business in McHenry County, Illinois. Charles H. Lumb, president of Chuck's Pub, signed a payment and performance guaranty. The subject matter of the lease agreement was a "Rair Air" french fryer. The term of the agreement was 48 months, and the monthly rental charge was $123.45. Paragraph 18 of the lease provided that the agreement shall be governed and interpreted in accordance with the laws of the State of Michigan.

On February 25, 1985, PLC filed a complaint in the circuit court

of McHenry County alleging that Chuck's Pub and Charles Lumb had defaulted on the lease agreement as of October 27, 1984. In their answer, defendants denied defaulting on the lease agreement and raised an affirmative defense predicated on the Illinois Consumer Fraud and Deceptive Business Practices Act (Act) (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*). Defendants alleged that the lease agreement was governed by the Act and that the lease was invalid and void because it was in contravention of the notice of cancellation provision contained in section 2B of the Act (Ill. Rev. Stat. 1985, ch. 121½, par. 262B). Section 2B provides that the seller must include a notice of cancellation statement with the contract informing the consumer that the agreement may be cancelled within three business days of execution. Defendants alleged that PLC failed to include a notice of cancellation in the lease agreement. Pursuant to section 2B, defendants sent a notice of cancellation to PLC which defendants claim effectively cancelled the lease agreement. Defendants concluded that their obligations under the agreement ceased except to return the french fryer. PLC admitted that defendants sent them a notice of cancellation but denied the remaining allegations.

Defendants then motioned for summary judgment reasserting the claim made in their affirmative defense to the complaint. In response, PLC asserted, *inter alia*, that Michigan law governed as provided in the lease agreement, and, therefore, defendants' reliance on the Act was misplaced. At the conclusion of the hearing on the summary judgment motion, the trial court granted summary judgment in favor of the defendants. The trial court subsequently issued a written order finding, *inter alia*, that Illinois law applied in determining the validity of the lease agreement.

On appeal, PLC argues that the trial court's ruling was erroneous because the law agreed on by the parties was not contrary to the public policy of Illinois and there was a reasonable relationship between the chosen law and the transaction. Defendants respond that applying Michigan law would violate Illinois public policy because there is no comparable notice of cancellation provision in the Michigan Consumer Protection Act (Mich. Comp. Laws sec. 445.901 *et seq.* (1984)) and there is no reasonable relationship between the parties or the transaction and Michigan law. Defendants further argue that the lease agreement is tantamount to an adhesion contract and therefore the choice of law provision should not be honored. Finally, defendants argue that the contract was unconscionable and for that reason the choice of law provision should not be upheld.

■■ ■ An express choice of law provision contained in a contract

will be given effect subject to certain limitations. (*Reighley v. Continental Illinois National Bank & Trust Co.* (1945), 390 Ill. 242, 249, 61 N.E.2d 29.) The primary limitation involves considerations of public policy. In the seminal case of *McAllister v. Smith* (1856), 17 Ill. 328, our supreme court stated that it would give effect to the laws of the site chosen "where it is not dangerous, inconvenient, immoral, nor contrary to the public policy of the local government." (17 Ill. 328, 334.) In *McAllister*, the supreme court was confronted with a contract containing a choice of law provision declaring that the usury laws of New York would govern the contract. The interest rates sanctioned by the New York law were higher than those permitted by the comparable Illinois usury law. Nevertheless, the court upheld the choice of law provision expressed by the parties. In so doing, the court stated in pertinent part:

> "[W]e find numberless cases, with great uniformity, sanctioning the enforcement of contracts made under and sanctioned by the laws of another State, which are not allowed by the laws of the State where suit is brought, or where a different rule prevails.
>
> Thus we find the marriage contract, legally solemnized or dissolved, under one jurisdiction, respected and enforced in another, under whose laws neither the obligation, nor its rescission would have been allowed. And so of the sale of lottery tickets and conduct of lotteries. So it is in relation to express or implied contracts for interest on money. Any rate per cent. sanctioned by the laws of the place where the contract is made, or by the substituted laws of the place where it is to be performed, or paid, will be recognized and enforced in the courts of other governments, whose laws would make such rate usurious. But there is a jealous vigilance of the courts to detect evasions of the usury laws, and when discovered, courts will withhold any aid to those who make foreign contracts a pretense for exacting usury at home." (17 Ill. 328, 334-35.)

Illinois courts have subsequently upheld express choice of law provisions against public policy attacks in cases addressing group insurance policies (*Hofeld v. Nationwide Life Insurance Co.* (1975), 59 Ill. 2d 522, 322 N.E.2d 454); marriage annulments (*Reighley v. Continental Illinois National Bank & Trust Co.* (1945), 390 Ill. 242, 61 N.E.2d 29); and, as in *McAllister*, New York usury laws (*Mell v. Goodbody & Co.* (1973), 10 Ill. App. 3d 809, 295 N.E.2d 97). On the other hand, gambling contracts valid under the foreign law chosen by the parties have not been enforced in Illinois because such contracts

contravene Illinois public policy. (*Thomas v. First National Bank* (1904), 213 Ill. 261, 72 N.E. 801; *Resorts International, Inc. v. Zonis* (N.D. Ill. 1984), 577 F. Supp. 876.) In short, the public policy considerations must be strong and of a fundamental nature to justify overriding the chosen law of the parties.

■ The lease agreement between PLC and Chuck's Pub provided in paragraph 18:

"This agreement shall be governed and interpreted in accordance with the laws of the State of Michigan. For purposes of resolving any issue pertaining to conflict of laws, this agreement shall be deemed to be fully and solely executed, performed and/or observed in the State of Michigan."

Even assuming, *arguendo*, that the Illinois Consumer Fraud and Deceptive Business Practices Act applies to a commercial lease transaction such as the one involved here, we do not believe that there is a sufficiently strong or fundamental public policy interest to justify overriding the parties' choice of Michigan law to govern the agreement. In an arm's-length business transaction, the parties' freedom to contract is an important right that must be jealously guarded and left free from unnecessary interference by the courts. Although the Michigan consumer protection statute does not include a notice of cancellation requirement, we are of the opinion that this difference alone does not warrant overriding the parties' expressed choice of law. "[A] court should not refuse to apply the law of a foreign State, however unlike its own, unless it is contrary to pure morals or abstract justice, or unless the enforcement would be of evil example and harmful to its people." (*Champagnie v. W. E. O'Neil Construction Co.* (1979), 77 Ill. App. 3d 136, 139, 395 N.E.2d 990.) We conclude that upholding the Michigan choice of law provision does not violate these fundamental concerns.

■ ■ A second recognized limitation to an express choice of law provision is the requirement that there be some relationship between the chosen forum and the parties or the transaction. (*Seeman v. Philadelphia Warehouse Co.* (1927), 274 U.S. 403, 71 L. Ed. 1123, 47 S. Ct. 626; *Mell v. Goodbody & Co.* (1973), 10 Ill. App. 3d 809, 295 N.E.2d 97.) The purpose of this requirement is to preclude parties from arbitrarily selecting the laws of some jurisdiction which has no relation to the matter in controversy. (16 Am. Jur. 2d *Conflict of Laws* sec. 78, at 126 (1979).) In *Mell*, the court applied the reasonable relationship test and found that the brokerage agreement involved had a sufficient relationship with the chosen forum to satisfy the reasonable relationship test. Pertinent to the present case is the

court's statement that despite the numerous contacts with the chosen forum, there was also a very substantial relationship with Illinois. (*Mell v. Goodbody & Co.* (1973), 10 Ill. App. 3d 809, 813, 295 N.E.2d 97.) Specifically, the stockbroker maintained three branch offices in Illinois, received payments on the pertinent accounts at those offices and the customer resided in Illinois. (10 Ill. App. 3d 809, 811, 295 N.E.2d 97.) Here, the record indicates that PLC's principal place of business was in Michigan, the contract was executed in Michigan, and PLC contacted the defendant from Michigan. In addition, payments due under the lease were to be sent to PLC's home office in Michigan. We find these contacts sufficient to establish a reasonable relationship between the chosen law and the transaction. See *Sumner Realty Co. v. Willcott* (1986), 148 Ill. App. 3d 497, 500, 499 N.E.2d 554.

■■ Defendants further argue for the first time on appeal that the lease agreement was an adhesion contract, and therefore the choice of law provision should not be given effect. An adhesion contract has been described as "a standardized contract prepared entirely by one party, and which, due to the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected by the second party on a 'take it or leave it' basis without opportunity for bargaining and under such conditions that the second party or 'adherer' cannot obtain the desired product or service save by acquiescing in the form of the agreement." (*Star Finance Corp. v. McGee* (1975), 27 Ill. App. 3d 421, 426, 326 N.E.2d 518.) Examples of such contracts, which are usually in printed form, include insurance policies, transportation tickets, commercial loan agreements and employment contracts. 16 Am. Jur. 2d *Conflict of Laws* sec 79, at 129 (1979); 6A Corbin, Contracts sec. 1446, at 490 (1962).

■■ In the instant case, the lease agreement was by all indications an arm's-length transaction executed between two business concerns. There is no suggestion of a take it or leave it posture by PLC, nor does it appear that PLC took advantage of defendants. Furthermore, a lease for a commercial french fryer is presumably available from other business concerns. Although the lease appears to be a standard form contract, based on the record in this case, we find this factor insufficient to vitiate the choice of law provision contained in the agreement.

■■ ■ Finally, defendants, again for the first time on appeal, argue that the lease agreement was unconscionable and, therefore, should not be enforced. In support of this contention, defendants

point to a disclaimer of warranty provision and two provisions addressing the rights and obligations of the parties in the event of default. An unconscionable contract is one "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man could accept, on the other." (*Neal v. Lacob* (1975), 31 Ill. App. 3d 137, 142, 334 N.E.2d 435.) Such a contract is usually improvident, totally one-sided or oppressive. (31 Ill. App. 3d 137, 142, 334 N.E.2d 430.) However, unless there was a defect in the negotiation process at the time the contract was formed, courts generally will not interfere with the agreement entered into by the parties even though certain provisions favor one party over another. (*Dana Point Condominium Association, Inc. v. Keystone Service Co.* (1986), 141 Ill. App. 3d 916, 920, 491 N.E.2d 63.) This is especially true in the context of an arm's-length agreement entered into between business concerns. *Dillman & Associates, Inc. v. Capitol Leasing Co.* (1982), 110 Ill. App. 3d 335, 341, 442 N.E.2d 311; *Walter E. Heller & Co. v. Convalescent Home of First Church of Deliverance* (1977), 49 Ill. App. 3d 213, 219-20, 365 N.E.2d 1285.

In the present case, there is no indication in the record that there were any transgressions in the negotiation process. Moreover, prior decisions have established that provisions similar to those relied on by defendant have not been viewed as unconscionable. Regarding the disclaimer provision in the subject lease agreement, similar provisions were found not to be unconscionable in *Dillman* and *Heller*. As to the default provisions, defendants have failed to cite any authority supporting their argument that these provisions were unconscionable. However, it appears that such provisions are not only not unconscionable, but fully enforceable. In *Dillman,* the lease included default provisions similar to those in the instant lease. After finding that the disclaimer provisions were not unconscionable, the court found that the lessor could recover pursuant to the default provisions. (*Dillman & Associates, Inc. v. Capitol Leasing Co.* (1982), 110 Ill. App. 3d 335, 338, 344, 442 N.E.2d 311.) The court's action in this regard indicates the lack of merit attendant to defendant's assertions on this point. We conclude that the instant lease agreement was not unconscionable.

In sum, the choice of law provision in the contract should have been upheld because Illinois public policy is not offended by applying Michigan law and there was a reasonable relationship between the chosen forum and the transaction. In addition, the record does not support a finding that the contract was one of adhesion or was unconscionable.

For the foregoing reasons, the judgment of the circuit court of McHenry County is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

NASH, J., concurs.

JUSTICE REINHARD, specially concurring:

I respectfully disagree with the conclusion reached by the majority that the public policy interest here is not sufficiently strong or fundamental to justify overriding a choice of law provision made by contracting parties and with its method of reaching this conclusion. The majority first assumed that the Illinois Consumer Fraud and Deceptive Business Practices Act (Act) is applicable to this transaction, a matter that is not clearly evident from the reading of the Act, and then determined that public policy considerations did not override the parties' choice of Michigan law.

The public policy of a State must be sought in its constitution, legislative enactments and judicial decisions. (*Roanoke Agency, Inc. v. Edgar* (1984), 101 Ill. 2d 315, 327, 461 N.E.2d 1365.) The Act was intended to have broad applicability (*Scott v. Association of Childbirth at Home, International* (1981), 88 Ill. 2d 279, 284, 430 N.E.2d 1012) to effectuate its purpose, as stated in the preamble of the Act, "to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Courts have perceived "a clear mandate from the Illinois legislature that the courts of this State are to utilize the Consumer Fraud Act to the utmost degree in eradicating all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers." *Warren v. Le May* (1986), 142 Ill. App. 3d 550, 563, 491 N.E.2d 464; *American Buyers Club of Mt. Vernon, Illinois, Inc. v. Honecker* (1977), 46 Ill. App. 3d 252, 257, 361 N.E.2d 1370.

Section 2B of the Act (Ill. Rev. Stat. 1985, ch. 121½, par. 262B), originally enacted in 1967, provides important protection to consumers by enabling them to cancel a transaction within three business days and by requiring the seller to give them written notice of their right to cancel. The section was recently amended, expanding the definitions and broadening the coverage of the section to be in conformity with Federal provisions covering door-to-door solicitations. See 83d Ill. Gen. Assem., House Proceedings, June 27, 1983,

at 287-88.

The need to provide consumers both with an opportunity to cancel transactions and with notice of their right to cancel has, therefore, long been recognized in Illinois, and this protection has recently been expanded. In my opinion, section 2B reflects a strong public policy to protect consumers and should not be avoided by a contract clause providing that another State's law should apply. The application of Michigan law, containing no similar provision, is contrary to the public policy of this State. Although the contract involved here was apparently between businessmen who quite probably have some sophistication in making contracts, the majority's decision has the same force and application to the ordinary consumer intended to be protected by that section as the majority assumes *arguendo* that the Act applies to this commercial lease transaction. To allow the party drafting the agreement to circumvent the salutary effect of the provisions of the Act by inserting a clause which would nullify the cancellation provision of section 2B would be contrary to our legislature's expression of Illinois public policy. See *American Buyers Club of Mt. Vernon, Illinois, Inc. v. Shaffer* (1977), 46 Ill. App. 3d 266, 269, 361 N.E.2d 1380 (where the appellate court held that to allow the method of giving notice of cancellation of the contract under section 2B to be regulated by the sales agreement between the parties would be contrary to the protection which the statute afforded and contrary to considerations of overriding public policy).

In my opinion, section 2B is a legislative enactment which reflects public policy considerations of a strong and fundamental nature and cannot be avoided by a contract provision stating that Michigan law governed the agreement.

Although I would not reverse the judgment below on the basis determined by the majority, plaintiff (PLC) has raised several other contentions which require reversal of the granting of defendants' motion for summary judgment.

Where a genuine issue of fact remains between the parties, the trial court errs in granting summary judgment. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500, 475 N.E.2d 872.) The affidavits filed by the parties dispute several material fact questions which affect whether the Act applies to this transaction. In an affidavit filed by PLC, it is stated that the person who initially contacted defendants was not an agent, representative, or employee of PLC. Defendant Charles Lumb filed an affidavit stating that he was contacted by someone representing himself as an agent of PLC. This disputed fact question must be resolved in a trial, for if the person

contacting defendants is not an agent of PLC, a financing company in this transaction, then this financing transaction may not fall within the scope of the Act. See *Christensen v. Numeric Micro, Inc.* (1987), 151 Ill. App. 3d 823, 829-30, 503 N.E.2d 558.

In addition, there is a genuine issue of material fact raised in the affidavits as to whether PLC's contact with defendants was consummated entirely by mail or telephone. If the person contacting defendants was not an agent or representative of PLC, it would then appear that the only contact for the financing agreement was by mail or telephone, thus falling within a specific exclusion from the application of the Act pursuant to section 2B (Ill. Rev. Stat. 1985, ch. 121½, par. 262B), which provides, in pertinent part, that: "[t]his section does not apply to any transaction *** (d) conducted and consummated entirely by mail or telephone without any other contact between the consumer and the person or its representative prior to delivery of the goods or performance of the services."

Also, PLC has raised the argument that defendant is not a "consumer" under the Act and is therefore not entitled to the protections of section 2B. PLC contends that the lease agreement involved here concerned the rental of a french fryer to be used in the operation of defendant's restaurant business, not for his own use, and cites *People ex. rel. Scott v. Cardet International, Inc.* (1974), 24 Ill. App. 3d 740, 746-47, 321 N.E.2d 386, which determined that the term "consumer" could not be read to include the purchaser of a franchise, who was a "businessman" acting as such in the conduct of "any trade or commerce."

The majority has not analyzed these arguments because of its decision to assume that the Act applies to the situation here. In my opinion, a serious question is raised on these facts as to whether the Act applies. If the Act does not apply to this situation, the validity of the choice-of-law provision in the parties' contract that Michigan law applies to the transaction may well be recognized under the circumstances here. By basing its decision on an assumption of the Act's applicability, the majority has decided an important question of public policy based on a transaction to which the Act very likely does not apply.

For the foregoing reasons, I disagree with the majority opinion, and, while agreeing for different reasons that the judgment below should be reversed, I would remand for trial based on the genuine issues of material fact presented in the affidavits.